2005 UT App 82

**Ali S. YAZD and Parvin Yousefi,
Plaintiffs and Appellants,**

v.

**WOODSIDE HOMES CORPORATION,
Defendant and Appellee.**

No. 20030993–CA.

Court of Appeals of Utah.

Feb. 25, 2005.

Rehearing Denied April 13, 2005.

J. Bryan Quesenberry and Stephen Quesenberry, Hill Johnson & Schmutz LC, Provo, for Appellants.

Timothy B. Smith and Ronald G. Russell, Parr Waddoups Brown Gee & Loveless, Salt Lake City, for Appellee.

Before BILLINGS, P.J., and GREENWOOD and THORNE, JJ.

## OPINION

THORNE, Judge:

¶ 1 Ali Yazd and Parvin Yousefi (the Buyers) appeal from the trial court's grant of summary judgment in favor of Woodside Homes Corporation (Woodside). We reverse.

## BACKGROUND

¶ 2 In the early 1990s, Woodside began planning and constructing a subdivision in Lindon, Utah. The subdivision involved three parcels of land, the last of which Woodside purchased from the Church of Jesus Christ of Latter-day saints (the LDS church) in 1992 (the LDS parcel). The LDS church had intended to build a large church building on the property; however, an engineering survey (the Delta report) revealed that the subsurface soil was extremely collapsible—a condition that leads to soil compaction when water is introduced to the soil—to a depth of at least twenty-seven feet. The LDS church, through its sales representative, informed Woodside of the less than ideal subsurface soil conditions, and according to the sales contract, Woodside was to be provided with a copy of the Delta report after the sale.

¶ 3 Prior to purchasing the LDS property, Woodside had performed its own examination of the subsurface soil conditions on the other two parcels involved in its subdivision. The resulting report informed Woodside that subsurface soil in these parcels was collapsible to a depth of approximately two feet. In response, Woodside added provisions to its plan for the removal of topsoil to a depth greater than the average weak soil depth as indicated by their engineering survey. After purchasing the LDS parcel, Woodside chose not to replicate its engineering survey, instead it chose to rely on its existing engineering report [1] without examining the soil on the LDS parcel. Woodside then proceeded with its construction plans.

¶ 4 In 1995, the Buyers entered into a contract with Woodside to purchase a lot within the subdivision and to have a house built upon the lot. Woodside did not disclose to the Buyers the result of either its engineering report or the Delta report. Thus, the Buyers entered into the purchase agreement with no knowledge of the subsurface soil deficiencies. The Buyers' lot was adjacent to the LDS parcel and approximately thirty feet from one of the test holes drilled during the preparation of the Delta report. After closing on the house in September 1995, the Buyers moved in. Soon after, beginning in 1996 and extending into 1997, the Buyers noticed cracks in the foundation, the basement floor, and the driveway. They also noticed that doors throughout the house were no longer square. When they brought these problems to Woodside's attention, Woodside

---

1. Woodside denies having ever received a copy of the Delta report from the LDS church, and thus denies having any knowledge of the true depth of the weak soil on or near the LDS parcel.

informed them that the cracks, etc., were normal and the result of nothing more than natural settling. Woodside then patched the cracks and assured the Buyers that they had no reason for concern.

¶ 5 The Buyers were placated by Woodside's assurances until 2002, when they put the house up for sale. They soon had a potential purchaser, but a prepurchase inspection of the home revealed that it sat on a sea of collapsible soil. The engineer who performed the inspection, Kenneth Karren, informed the Buyers of the extent of the problem, and the Buyers learned, after engaging the services of another soil engineer, that it would take a great deal of money to repair the house and ensure that the poor subsurface soil caused no additional damage.

¶ 6 Consequently, in April 2002, the Buyers filed suit against Woodside. The Buyers alleged that Woodside's failure to disclose the presence of the collapsible soil was a breach of the contractual warranty and that it amounted to a fraudulent nondisclosure. Pursuant to a motion to compel arbitration, the trial court submitted all of the Buyers' contract claims to arbitration. Following the successful completion of arbitration, Woodside filed for summary judgment on the Buyers' fraud claims. The trial court granted the motion, dismissing the Buyers' complaint after concluding that Woodside had neither real, nor constructive, knowledge of the contents of the Delta report. The Buyers now appeal.

## ISSUE AND STANDARD OF REVIEW [2]

 ¶ 7 The Buyers argue that the trial court's decision to grant Woodside's motion for summary judgment was incorrect.

In reviewing a grant of summary judgment, we give no deference to the trial court with respect to its legal conclusions. Rather, we make our own determination as to whether the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

*Smith v. Frandsen,* 2004 UT 55,¶ 6, 94 P.3d 919 (citations omitted). Additionally, we view " 'the facts in a light most favorable to the losing party below.' " *Goodnow v. Sullivan,* 2002 UT 21,¶ 7, 44 P.3d 704 (quoting *Blue Cross & Blue Shield v. State,* 779 P.2d 634, 636–37 (Utah 1989)).

## ANALYSIS

 ¶ 8 The Buyers assert that during the purchase of their property and the negotiations for the construction of their home, Woodside either fraudulently concealed or fraudulently failed to disclose the presence of collapsible soil under and surrounding their property. The elements required to satisfy these claims are identical. *See Smith v. Frandsen,* 2004 UT 55,¶ 12, 94 P.3d 919

2. During the pendency of this appeal, Woodside filed a motion to dismiss the appeal as moot. Woodside argued that because the Buyers had received an arbitration award equal to their actual damages, pursuant to their contract claims, they were precluded from seeking any additional damages. In essence, Woodside argues that further recovery is barred under the doctrine of election of remedies and because the Buyers are not entitled to receive a double recovery of damages for their claim. After consideration, we conclude that Woodside is incorrect, and the issue is not moot. Thus, we deny Woodside's motion.

Woodside failed to raise in the trial court either its election of remedies argument or its double recovery argument. "The defense of election of remedies is an affirmative one and must be raised by way of answer, motion, or demand so as to put the issue before the trial court, and is not to be raised for the first time on appeal." *Royal Res., Inc. v. Gibralter Fin. Corp.,* 603 P.2d 793, 796 (Utah 1979) (footnotes omitted). Thus, we do not address this argument, and deny Woodside's motion to the extent it relies upon this doctrine.

Moreover, we have previously addressed an argument similar to Woodside's concern that any additional recovery awarded to the Buyers would amount to a windfall double recovery. In *Brown v. Richards,* among a host of other issues, we addressed whether damages awarded for breach of warranty and damages awarded for fraud were necessarily duplicative and concluded that they were not. *See* 840 P.2d 143, 152–53 (Utah Ct.App.1992). Central to our determination was the nature of these claims and whether any grounds existed to conclude that they may not be duplicative. *See id.* Here, the Buyers' fraud claim asks for damages not *necessarily* duplicative of the breach of warranty damages that have already been awarded. Therefore, we are not in a position to summarily deny the Buyers additional recovery and instead must deny Woodside's motion to dismiss.

(equating the elements of fraudulent concealment with the elements of fraudulent nondisclosure discussed in *Hermansen v. Tasulis,* 2002 UT 52,¶ 24, 48 P.3d 235). To establish either claim, the Buyers " 'must prove the following three elements: (1) the nondisclosed information is material, (2) the nondisclosed information is known to the party failing to disclose, and (3) there is a legal duty to communicate.' " *Frandsen,* 2004 UT 55 at ¶ 12, 94 P.3d 919 (quoting *Hermansen,* 2002 UT 52 at ¶ 24, 48 P.3d 235); *see also Mitchell v. Christensen,* 2001 UT 80,¶ 9, 31 P.3d 572.

¶ 9 There is little question that the information contained in the Delta report would have been material to the Buyers in this case. *See Hermansen,* 2002 UT 52 at ¶ 29, 48 P.3d 235 (defining materiality to be "something which a buyer or seller of ordinary intelligence and prudence would think to be of *some* importance in determining whether to buy or sell" (emphasis added) (quotations and citation omitted)). The Delta report stated that the subsurface soils found no more than thirty feet from the Buyers' lot were unstable to a depth of nearly thirty feet, and this information was central to the LDS church's decision to sell the property, rather than build on it. Although the report may not have dealt directly with the condition of the soil under the Buyers' lot, we cannot say as a matter of law that the information would not have been of some interest to the Buyers. *See id.* Consequently, the information in the Delta report is material.

¶ 10 We can say, however, that if Woodside possessed the Delta report, or had knowledge of its content, prior to concluding the sale with the Buyers, it had a duty to disclose the information to the Buyers. " 'The issue of whether a duty exists is entirely a question of law to be determined by the court.' " *Frandsen,* 2004 UT 55 at ¶ 14, 94 P.3d 919 (quoting *Ferree v. State,* 784 P.2d 149, 151 (Utah 1989)). In *Frandsen,* the supreme court examined the duty that a developer has "to protect unsophisticated purchasers." *Id.* at ¶ 16. Relying on existing case law, the court stated that a developer has

"a duty to exercise reasonable care to insure that the subdivided lots are suitable for construction of some type of ordinary, average dwelling house, and he must disclose to his purchaser any condition which he knows or reasonably ought to know makes the subdivided lots unsuitable for such residential building. He has a further duty to disclose, upon inquiry, information he has developed in the course of the subdivision process which is relevant to the suitability of the land for its expected use."

*Id.* (quoting *Loveland v. Orem City Corp.,* 746 P.2d 763, 769 (Utah 1987)). Applying this standard, the court found that "the law imputes to builders and contractors a high degree of specialized knowledge and expertise with regard to residential construction," expertise normally not possessed by unsophisticated purchasers. *Id.* at ¶ 18. As part of this specialized knowledge, "builder-contractors are expected to be familiar with conditions in the subsurface of the ground," *id.* at ¶ 19, and if there is a problem with the subsurface soils, the builder is charged with a duty to disclose.

¶ 11 Woodside argues that through its own efforts it discovered and removed a layer of weak subsurface soils that existed throughout the subdivision and that, through a subsequent engineering inspection, it was assured that no additional problems existed in the subsoil. Woodside, however, misapprehends the scope of its duty in this circumstance. Assuming, as we must for purposes of reviewing a trial court's summary judgment decision, that the Buyers are correct and that Woodside was provided with the Delta report prior to the sale to the Buyers, then our focus is properly upon the Delta report and whether it would have been material to the Buyers' decision to purchase. Having determined that the report would have been material, as it contained information that would have been of *some* interest to the Buyers in making their decision to buy, *see Hermansen,* 2002 UT 52 at ¶ 29, 48 P.3d 235, we conclude that Woodside had a duty to disclose the report, or its contents, if Woodside received the report prior to the sale to the Buyers.

¶ 12 Finally, and most importantly to this case, we address the knowledge element.[3] We note first that

> summary judgment is almost never appropriate in a fraudulent concealment case, except "(i) when the facts are so clear that reasonable persons could not disagree about the underlying facts or about the application of the governing legal standards to the facts or (ii) when the facts underlying the allegation of fraudulent concealment are so tenuous, vague, or insufficiently established that they fail to raise a genuine issue of material fact as to concealment, with the result that the claim fails as a matter of law."

*McDougal v. Weed*, 945 P.2d 175, 179 (Utah Ct.App.1997) (quoting *Berenda v. Langford*, 914 P.2d 45, 54 (Utah 1996)).

¶ 13 In support of their claim that Woodside knew of, or was in possession of, the Delta report, the Buyers submitted a host of materials attached to their opposition to Woodside's summary judgment motion. Included among these materials was a copy of the purchase agreement between Woodside and the LDS church for the LDS parcel. Contained in that contract is a promise that the LDS church would supply Woodside with "a copy of the soils report previously completed on the project," i.e., the Delta report. The opposition also contained the deposition testimonies of Kenneth Karren and Blaine Livingston. Karren, an engineer hired to inspect the Buyers' home during their attempt to sell the property, testified that to the best of his recollection Woodside had received the Delta report and that he had been given portions of the report while he was investigating the damage to another house in the same neighborhood in 1996. Livingston, who was the LDS church's real estate sales representative for the sale of the LDS parcel, testified that prior to the sale he had informed Woodside of the existence of the Delta report and that the parcel's subsurface soil condition was less than ideal.

¶ 14 In contrast, Woodside denies ever receiving a copy of the Delta report, and claims that although it was informed of the presence of collapsible soil on the parcel, it was not made aware of the scope of the problem. However, when faced with a summary judgment issue, we are compelled to draw the facts and inferences in the favor of the non-moving party—in this case the Buyers—and after doing so, we conclude that sufficient disputed material facts exist to create a genuine issue for trial. *See Hermansen*, 2002 UT 52 at ¶ 31, 48 P.3d 235.

## CONCLUSION

¶ 15 The Delta report contained information that likely bore on the stability of the land upon which the Buyers' home was built. If Woodside was privy to the information contained in the report prior to selling the property and building the Buyers' home, Woodside had a duty to disclose this information. Thus, the question of whether Woodside received the Delta report is material to the Buyers' allegations of fraudulent concealment and nondisclosure. Because the Buyers presented sufficient evidence to support their claim that Woodside received the report prior to the sale, summary judgment was improperly granted.

¶ 16 Accordingly, we reverse the trial court's grant of Woodside's motion for summary judgment and remand for proceedings consistent with this opinion.

¶ 17 WE CONCUR: JUDITH M. BILLINGS, Presiding Judge and PAMELA T. GREENWOOD, Judge.

---

**3.** The sole basis for the trial court's grant of summary judgment was its conclusion that Woodside did not know of the Delta report prior to selling the property to the Buyers. The trial court assumed that the presence of collapsible soil on the adjacent lot was material and, for purposes of the motion, Woodside did not dispute its duty to disclose.