2006 UT 47

**Ali S. YAZD and Parvin Yousefi, Plaintiffs and Respondents,**

v.

**WOODSIDE HOMES CORPORATION, Defendant and Petitioner.**

**No. 20050444.**

Supreme Court of Utah.

Sept. 1, 2006.

Stephen Quesenberry, J. Bryan Quesenberry, Provo, for plaintiffs.

Ronald G. Russell, Timothy B. Smith, Salt Lake City, for defendant.

NEHRING, Justice:

¶ 1 When Ali Yazd and Parvin Yousefi's Lindon, Utah home sank into the unstable

soil upon which it lay, they sued. They claimed that home-seller Woodside Homes fraudulently concealed information contained in a report, the "Delta report," about a deep layer of collapsible soil present on land that Woodside owned adjacent to the Yazd–Yousefi property.

¶ 2 The district court granted Woodside's motion for summary judgment and dismissed the Yazd–Yousefi fraudulent concealment claims. It based its ruling on the undisputed fact that Woodside was unaware of unsuitable soil conditions either on the Yazd–Yousefi land or elsewhere in its development. The court of appeals reversed.

¶ 3 We granted certiorari. We affirm the court of appeals' reversal of summary judgment. However, we reverse the court of appeals' holding that the Delta report was material as a matter of law. We also correct the court of appeals' misapprehension that the materiality of the Delta report is relevant to whether Woodside owed the homeowners a duty to disclose the contents to them. Finally, we hold that a developer-builder may owe his buyer a duty to disclose information known to him about the composition or characteristics of any real property when that information is material to the suitability of the property purchased by the buyer.

## BACKGROUND

¶ 4 In the early 1990s, Woodside undertook the development of the Panorama Point subdivision in Lindon, Utah. The subdivision included three parcels of land, the last of which was purchased in 1992 from the Church of Jesus Christ of Latter-day Saints, which we will call the "Church." The Church had intended to construct a large structure on the property. The Church abandoned this plan, however, after the Delta report (named after the firm which compiled it) revealed that an excess of moisture-sensitive collapsible soil made the site unsuitable for the contemplated building. The Delta report did not specifically evaluate the suitability of the site for a single family residence.

¶ 5 The Church agreed to sell the parcel of property to Woodside. According to the sales contract, the Church was to provide a copy of the Delta report to Woodside. Woodside claims it never saw the report.

¶ 6 Before the Yazd–Yousefi home was built, Woodside obtained its own study of the soil conditions on two other parcels that comprised Panorama Point. The Yazd–Yousefi lot was within the area covered by the study. The soil study indicated the presence of collapsible soil to an average depth of approximately two and one-half feet. Accordingly, Woodside formulated a plan to dig out the collapsible soil and reduce the grade of these parcels between six and eight feet. After the work was completed, William Gordon, an engineer, inspected the area at the behest of Woodside and pronounced the soil fit to support a house. In 1995, Mr. Yazd and Ms. Yousefi contracted with Woodside to purchase a lot and build a home in Panorama Point. Woodside did not disclose the contents of the Delta or Woodside's own soil reports to Mr. Yazd or Ms. Yousefi.

¶ 7 Mr. Yazd and Ms. Yousefi moved into their home in September 1995. By 1996, cracks appeared in the foundation and the driveway. Doors would not open or close. Evidence of excessive settling abounded. Mr. Yazd and Ms. Yousefi accepted Woodside's efforts to repair the damage until April 2002 when a prospective purchaser of the home discovered that, owing to the instability of the soil, major repairs would be required to shore-up the house and prevent additional damage.

¶ 8 With this discovery, Mr. Yazd and Ms. Yousefi decided to seek legal relief. They sued Woodside. They alleged that Woodside's failure to disclose the presence of the collapsible soil in the area amounted to a breach of contract and fraudulent nondisclosure. The district court referred the Yazd–Yousefi contract claims to arbitration; these claims do not concern us here. The district court then dismissed the Yazd–Yousefi fraudulent nondisclosure and concealment claims. The district court based its ruling on a determination that Woodside had neither real nor constructive knowledge of the continued presence of collapsible soil on the buyers' lot.

¶ 9 On appeal, the court of appeals reversed and remanded the case to the district court. The court of appeals concluded that

the Delta report did contain material information that Woodside had a duty to disclose to the buyers and, since the question of whether Woodside actually had knowledge of the report was in dispute, that summary judgment was improperly granted.

## ANALYSIS

■ ¶ 10 In order to prevail on a claim of fraudulent concealment, a plaintiff must prove "(1) that the nondisclosed information is material, (2) that the nondisclosed information is known to the party failing to disclose, and (3) that there is a legal duty to communicate." *Mitchell v. Christensen*, 2001 UT 80, ¶ 9, 31 P.3d 572. These elements are presented in inverse order of importance. As we will see, this reverse ordering of elements may have led the court of appeals to apply a flawed analytical process that nevertheless yielded the correct result: a reversal of the district court.

## I. WOODSIDE'S RELATIONSHIP WITH MR. YAZD AND MS. YOUSEFI CREATED A LEGAL DUTY

■ ¶ 11 We have stated that "[i]t is axiomatic that one may not be liable to another in tort absent a duty." *Loveland v. Orem City Corp.*, 746 P.2d 763, 765 (Utah 1987). Any analysis of a tort claim, then, begins with an inquiry into the existence and scope of the duty owed the plaintiff by the defendant.

■ ¶ 12 The court of appeals, however, began its analysis by examining the materiality of the Delta report following the sequence of elements set out in *Mitchell*. The court of appeals then wasted little time reaching the conclusion that "[t]here is little question that the information contained in the Delta report would have been material to the Buyers in this case." *Yazd v. Woodside Homes Corp.*, 2005 UT App 82, ¶ 9, 109 P.3d 393.

¶ 13 With its finding of materiality in hand, the court of appeals moved on to the matter of duty. The court appeared to link the materiality of the Delta report to the existence of Woodside's duty when it stated, "We can say, however, that if Woodside possessed the Delta report, or had knowledge of its content, prior to the sale with the Buyers, it had a duty to disclose the information to the Buyers." *Id.* ¶ 10. It is important that the court of appeals' opinion not be read to suggest that the materiality of the Delta report created Woodside's duty to disclose the contents of the report to Mr. Yazd and Ms. Yousefi. Indeed, materiality becomes an issue only after a legal duty has been established.

■ ¶ 14 The determination of whether a legal duty exists falls to the court. It is a purely legal question, and since in the absence of a duty a plaintiff will not be entitled to a remedy, it is the first question to be answered. *See Loveland*, 746 P.2d at 766.

■ ¶ 15 From where does a duty arise? To properly answer the duty question, a court must understand that the structure and dynamics of the relationship between the parties gives rise to the duty. "The question of whether a duty exists is a question of law. As always, resolution of this issue begins with an examination of the legal relationships between the parties, followed by an analysis of the duties created by these relationships." *Id.*

■■ ¶ 16 A relationship that is highly attenuated is less likely to be accompanied by a duty than one, for example, in which parties are in privity of contract. Age, knowledge, influence, bargaining power, sophistication, and cognitive ability are but the more prominent among a multitude of life circumstances that a court may consider in analyzing whether a legal duty is owed by one party to another. Where a disparity in one or more of these circumstances distorts the balance between the parties in a relationship to the degree that one party is exposed to unreasonable risk, the law may intervene by creating a duty on the advantaged party to conduct itself in a manner that does not reward exploitation of its advantage.

■ ¶ 17 Legal duty, then, is the product of policy judgments applied to relationships. *DeBry v. Valley Mortgage Co.*, 835 P.2d 1000, 1003–04 (Utah Ct.App.1992) ("Duty is not sacrosanct in itself, but only an expression of the sum total of those consider-

ations of policy which lead the law to say that the particular plaintiff is entitled to protection." (internal quotation marks and brackets omitted)). A person who possesses important, even vital, information of interest to another has no legal duty to communicate the information where no relationship between the parties exists.

¶ 18 An example which illustrates this point is the "special relationship" doctrine in tort law. A person has no legal duty to protect another person from the conduct of a stranger unless the person upon whom a duty is sought to be imposed has a "special relationship" with either the stranger or the potential victim. Rather, "[t]he duty to control another person may arise where a special relationship exists." *Wilson v. Valley Mental Health*, 969 P.2d 416, 419 (Utah 1998); *see also* Restatement (Second) of Torts § 315 (1977) (stating that a duty is premised on a special relationship); *Higgins v. Salt Lake County*, 855 P.2d 231, 236 (Utah 1993) (adopting Restatement position). Here, it is Woodside's status as builder-contractor that gives rise to its legal duty to the home buyers. The communication of material information to Mr. Yazd and Ms. Yousefi is one of the obligations that flow from Woodside's assumption of its legal duty.

¶ 19 There are occasionally instances in which a court is called upon to make policy choices based on assessments of social, economic, and technological conditions. To cite but one example, the maturation of the industrial revolution and, in particular, the ever lengthening chain of participants in the manufacture of goods cut deeply into the doctrines of caveat emptor and privity of contract that had served well an agrarian and economically insular nation prior to the last century. This changed in *MacPherson v. Buick Motor Co.*, where Justice Cardozo held that manufacturers must exercise reasonable care to protect consumers and others who, despite a lack of privity or direct contractual contact with the manufacturer, may come into contact with their products. 217 N.Y. 382, 390, 111 N.E. 1050 (1916).

¶ 20 Typically, courts cede authority over matters of policy to the political branches of government. When policy consider-ations bear on a subject lodged firmly within the court's sphere, like the common law, it is entirely appropriate for the court to make the policy judgments necessary to get the law right.

¶ 21 We have never explicitly recognized that a duty is owed to buyers of homes by builder-contractors. Insofar as we have signaled a willingness to impose this duty, it has been by indirection and expressed in dictum. In *Smith v. Frandsen*, 2004 UT 55, ¶ 9, 94 P.3d 919, we turned away an attempt by the Smiths, owners of a home that had been constructed on unsuitable soil, to impose a duty on the developer of the subdivision where the home was located. Our reasons for doing so had as much to do with the conclusions that we reached about the scope of knowledge acquired and the responsibility assumed by the Smiths' contractor-builder as with the issue of whether the developer knew of the poor soil conditions and whether that knowledge was material.

¶ 22 Our focus in *Smith* was not on whether the relationship between the Smiths and their builder-contractor imposed a legal duty to disclose information about soil conditions. After all, the builder-contractor was not a party to the lawsuit. The inquiry into the builder-contractor's role was, instead, directed at whether parity existed between what the builder-contractor knew about the condition of the soil that lay beneath the Smiths' house and the developer's knowledge of the same soil instability. This was relevant to our analysis of the developer's duty because we had formerly indicated that a remote purchaser who had no privity of contract with a developer might nevertheless recover for breach of the developer's duty to disclose unsuitable soil conditions to a previous unsophisticated purchaser who had no knowledge of the adverse conditions. *Id.* ¶ 25.

¶ 23 *Smith* required us to define limits on the right to recover from remote parties. One limiting principle that we recognized and applied in *Smith* was that a duty to disclose material information is extinguished once the information is communicated or otherwise acquired by the party to whom the duty was owed. *Id.* ¶ 17.

¶ 24 Modern home construction requires a high degree of knowledge and expertise, including knowledge of soil conditions. We have found that the disparity in skill and knowledge between home buyers and builder-contractors leads buyers to rely on the builder-contractor's expertise. Based on these observations, we chose to adopt in *Loveland*, 746 P.2d 763, a statement of duty borrowed from Wyoming of " 'reasonable care to insure that the subdivided lots are suitable for construction of some type of ordinary, average dwelling house and he must disclose to his purchaser any condition which he knows or reasonably ought to know makes the subdivided lots unsuitable for such residential building.' " *Id.* at 769 (emphasis omitted) (quoting *Anderson v. Bauer*, 681 P.2d 1316 (Wyo.1984)).

¶ 25 The imposition of this duty had the effect in *Smith* of imputing to the builder-contractor the knowledge of deficient soil conditions that the Smiths accused the developer of failing to disclose to them. The imputation of this knowledge, however, cut off any duty the developer may otherwise have owed to future owners of the property, including the Smiths.

¶ 26 Although we did not recognize the duty of the builder-contractor in the context of a direct action for recovery brought by a home buyer in *Smith*, we today extend its application to that setting. To do otherwise would fatally undermine the legitimacy of our reasoning in *Smith*.

## II. THE MATERIALITY OF THE DELTA REPORT IS IN DISPUTE AND PROPERLY LEFT TO THE FINDER OF FACT TO DETERMINE

¶ 27 The court of appeals held the Delta report to be material as a matter of law. Woodside takes issue with this determination for three reasons: the Delta report did not concern the Yazd–Yousefi lot, the court of appeals misread the Delta report in ways that led it to believe it was relevant to the Yazd–Yousefi lot when it was not, and Woodside's soil study on the Panorama Point property including the Yazd–Yousefi lot superseded any materiality to which the Delta report might make claim.

¶ 28 We do not believe that the Delta report has earned the designation of "material" as a matter of law and therefore reverse the court of appeals on this point. Neither do we accept Woodside's invitation to stamp the Delta report "immaterial" as a matter of law. Rather, we find that the question of the report's materiality is best suited for the finder of fact to answer.

¶ 29 Woodside's contention that the Delta report cannot be material because it describes soil conditions on land other than the Yazd–Yousefi lot has little to recommend it. Property boundaries are seldom drawn with soil composition in mind, and information about the suitability of soil for supporting a dwelling would more likely than not be relevant to predicting the soil conditions on similar adjacent land. We decline to categorically deem immaterial all information concerning property not owned by the party affected by unsuitable soil conditions. For the purpose of determining materiality in this case, property boundaries are legally insignificant.

¶ 30 Whatever errors in interpreting the Delta report may have predisposed the court of appeals to conclude that the report was material as a matter of law were not so significant as to persuade us to summarily rule the report immaterial. The Delta report disclosed soil instability of a magnitude that caused the Church to scuttle its building plans for the site. There were no obvious physical or topographical features that would distinguish the Church parcel from the other portions of Panorama Point. In our view, these considerations are sufficient to place the question of the Delta report's materiality in dispute.

¶ 31 Finally, we reject Woodside's assertion that by commissioning its own soil study on property that included the Yazd–Yousefi lot, it rendered immaterial all other information bearing on the soil conditions at Panorama Point. Woodside insists that it had no knowledge of the Delta report. Based on this assertion, its soil study was necessarily prepared without the benefit of information contained in the Delta report concerning conditions on the adjacent parcel. At this stage

of the litigation, we do not know whether knowledge of soil conditions on the Church parcel would have affected the Woodside soil report. Certainly, it is possible that it could. If the finder of fact were to determine that Woodside knew of the Delta report but failed to inform its soils expert of its existence and contents, the weight of the Woodside soil report could be substantially diminished.

## III. WE REFINE THE DEFINITION OF "MATERIALITY" IN THE CONTEXT OF MATTERS THAT MUST BE COMMUNICATED BY A BUILDER–CONTRACTOR

¶ 32 In holding that the Delta report was material as a matter of law, the court of appeals relied on a definition of materiality as " 'something which a buyer or seller of ordinary intelligence and prudence would think to be of *some* importance in determining whether to buy or sell.' " *Yazd v. Woodside Homes Corp.*, 2005 UT App 82, ¶ 9, 109 P.3d 393 (emphasis in original) (quoting *Hermansen v. Tasulis*, 2002 UT 52, ¶ 29, 48 P.3d 235). In particular, the court of appeals focused on the word "some" in the definition. We confess that "some" as used in our description of materiality is ambiguous. When used in a context in which additional precision concerning quantity or quality is sought, the word "some" is inherently ambiguous. "Some" is a word that refers to an unspecified quantity or quality. It is a word that diminishes precision, not adds to it. When the young man proclaims to his mother-in-law, "That was *some* dinner," we are left with considerable uncertainty about the mother-in-law's talents as a chef. We believe that when the court of appeals stated that "we cannot say as a matter of law that the information would not have been of some interest to the Buyers," *id.*, it treated "some" in a way that would permit matters of lesser importance to qualify as material. This interpretation is not what we intended.

¶ 33 We take this opportunity to clarify the definition of materiality as the term is used as an element of fraudulent concealment and fraudulent nondisclosure. We believe that requisite clarity can be achieved by deleting the word "some" from the definition we

adopted in *Hermansen*, 2002 UT 52, ¶ 29, 48 P.3d 235.

¶ 34 To be material, the information must be "important." Importance, in turn, can be gauged by the degree to which the information could be expected to influence the judgment of a person buying property or assenting to a particular purchase price. In this case, we conclude that a finder of fact could reasonably find that the contents of the Delta report meet this definition of materiality. Therefore, we decline to pass on the status of the Delta report as a matter of law.

## CONCLUSION

¶ 35 The three elements of fraudulent concealment are best described in this order: (1) there is a legal duty to communicate information, (2) the nondisclosed information is known to the party failing to disclose, and (3) the nondisclosed information is material. In this case, these elements are yet to be adjudicated and remain to be proved. The most important element is the existence of a duty, which arises from the relationship between the parties. We hold that a developer-builder may owe his buyer a duty to disclose information known to him concerning real property, including property other than that conveyed to the buyer, when that information is material to the condition of the property purchased by the buyer. Both knowledge of the Delta report and its importance to the buyers remain contested factual issues that bear on the existence of a duty. Thus, we affirm the court of appeals' reversal of summary judgment.

¶ 36 Finally, we reverse the court of appeals' holding that the Delta report was material as a matter of law. We leave the trier of fact to determine whether the Delta report was known to Woodside and whether its content was sufficiently important such that its disclosure would have influenced the decisions made by the buyers with respect to this property.

¶ 37 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Judge CHRISTIANSEN concur in Justice NEHRING's opinion.

¶ 38 Having disqualified herself, Justice PARRISH does not participate herein; District Judge TERRY L. CHRISTIANSEN sat.