**2013 UT App 202**

# THE UTAH COURT OF APPEALS

JACK WALKER,
Plaintiff and Appellant,
*v.*
ANDERSON-OLIVER TITLE INSURANCE AGENCY, INC.; STEWART
TITLE GUARANTY COMPANY; AND DANIEL G. ANDERSON,
Defendants and Appellees.

Opinion
No. 20111048-CA
Filed August 15, 2013

Seventh District, Moab Department
The Honorable Wallace A. Lee
No. 090700198

Matthew N. Evans and S. Brandon Owen,
Attorneys for Appellant
George W. Burbidge II, Geoffrey C. Haslam, and
Tyler V. Snow, Attorneys for Appellees Anderson-
Oliver Title Insurance Agency, Inc. and
Daniel G. Anderson
Laura S. Scott, Attorney for Appellee Stewart Title
Guaranty Company

JUDGE STEPHEN L. ROTH authored this Opinion, in which JUDGES
WILLIAM A. THORNE JR. and CAROLYN B. MCHUGH concurred.

ROTH, Judge:

¶1     Plaintiff Jack Walker appeals the district court's grant of
summary judgment in favor of Defendants Anderson-Oliver Title
Insurance Agency, Inc. (A-O Title), Stewart Title Guaranty

Company (Stewart Title), and Daniel G. Anderson (collectively, the Defendants) on various tort claims.[1] We affirm.

BACKGROUND[2]

¶2     In 2003, in connection with the sale and purchase of commercial property in downtown Moab, Utah (the Bank Property), the prospective buyers (the Buyers) contracted with A-O Title to prepare a commitment for title insurance (the Commitment) and to issue a title insurance policy (the Title Insurance Policy) to "insure that upon closing, there will be vested in [the Buyers] good and marketable fee simple title to the [Bank] Property, free and clear of all liens, encumbrances, and other objections and exceptions to title other than the permitted exceptions." The Buyers did not ask A-O Title to prepare an abstract of title.

¶3     Walker owns property immediately adjacent to the Bank Property on which he has operated a drug store (the Walker Property) for several decades. In the course of its search of county records, A-O Title became aware of two special warranty deeds related to the Bank Property (the Access Deeds). Walker recorded the Access Deeds in 1969, purporting to convey to himself an easement on and over the Bank Property for access to and parking for his business. The Defendants determined, however, that Walker was not the record owner of the Bank Property when he recorded

---

[1]A-O Title is an agent for Stewart Title, a national title insurance underwriter, and Anderson is an owner of A-O Title.

[2]In reviewing the district court's grant of summary judgment, we view "the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (citation and internal quotation marks omitted).

the Access Deeds. After some discussion, the Defendants ultimately determined that the Access Deeds did not create a valid easement on the Bank Property and, therefore, decided not to list them as exceptions in either the Commitment or the Title Insurance Policy. In other words, the Defendants decided that "they were willing to insure title" to the Bank Property "against loss or damage [for any claim] . . . aris[ing]" from the Access Deeds. The Defendants then issued the Commitment and the Title Insurance Policy without listing the Access Deeds as exceptions to coverage or otherwise disclosing them in either document. The Buyers subsequently closed on the sale of the Bank Property with their title to the property insured by the Defendants.

¶4     Sometime after closing, the Buyers approached Walker and explained that they planned to expand the building located on the Bank Property. The expansion would have extended the building into the area that Walker used for access to and parking for his business. Walker informed the Buyers of his claimed interest in the Bank Property and provided them with copies of the Access Deeds. The Buyers disputed the validity of the easement purportedly created by the Access Deeds, and Walker brought suit against the Buyers in federal court. At the conclusion of the federal lawsuit, a jury found that the Access Deeds did not create a valid easement but determined that Walker nonetheless had an easement under theories of express oral agreement, estoppel, and prescriptive easement.

¶5     Walker then brought this suit against the Defendants alleging various causes of action sounding in tort, including negligence and intentional interference with economic relations, or tortious interference. He sought general damages and recovery of attorney fees expended in the federal litigation. In alleging his claim for negligence, Walker asserted that "by virtue of their extensive review and analysis of" county records that affected the Bank Property, the Defendants owed a duty to Walker and breached that duty by failing to disclose the Access Deeds to the Buyers in either the Commitment or the Title Insurance Policy. In

alleging his claim for tortious interference, Walker asserted that the Defendants intentionally interfered with his economic relations in operating his business and did so "for an improper purpose and/or by improper means" by discovering and then failing to disclose the Access Deeds to the Buyers in the Commitment and the Title Insurance Policy. In support of his claims, Walker alleged that in preparing the Commitment and the Title Insurance Policy, the Defendants had acted as abstractors and had assumed and then breached the duties typically imposed on abstractors. Ultimately, he alleged that had the Buyers been advised of the Access Deeds, they would not have purchased the Bank Property and Walker's use of a portion of that property would not have been challenged.

¶6     The Defendants moved for summary judgment on Walker's claims, arguing that in preparing and issuing the Commitment and the Title Insurance Policy they had acted only as title insurers, not as abstractors, and therefore were subject to liability only under the terms of the insurance contract and not in tort. In opposition to the Defendants' motion, Walker argued that there were genuine issues of material fact as to whether the Defendants had acted as abstractors rather than title insurers in preparing and issuing the Commitment and the Title Insurance Policy. Walker also argued that the Defendants "owed a separate duty to Walker," regardless of whether they had acted as abstractors. The district court granted the Defendants' motion for summary judgment, concluding that, as a matter of law, they had acted as title insurers, not as abstractors, and had no duty to Walker. Walker appeals.

ISSUE AND STANDARD OF REVIEW

¶7     Walker challenges the district court's decision to grant the Defendants' motion for summary judgment on his claims for negligence and tortious interference. A district court's decision to grant summary judgment presents a question of law that is reviewed for correctness. *Chapman v. Uintah Cnty.*, 2003 UT App 383, ¶ 5, 81 P.3d 761.

ANALYSIS

I. Summary Judgment

¶8     To be entitled to summary judgment, the moving party must show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). Walker argues that the district court erred in granting summary judgment on his claims for negligence and tortious interference. In particular, he challenges the district court's determination that there were no genuine issues of material fact as to whether the Defendants assumed and negligently breached the duties of an abstractor. He also argues that the district court improperly disposed of his claim for tortious interference and an alternative theory of negligence because the court ignored his argument that these claims depended on a duty distinct from that of an abstractor. We conclude that under Utah case law, except in unusual circumstances not present here, title insurers are not held liable as abstractors. We also conclude that Walker's other tort claims fail because they attempt to impose abstractor liability on title insurers contrary to Utah law.

A.     Abstractor Liability

¶9     The distinction between abstractors and title insurers is important because abstractors may be held liable in tort while title insurers generally are liable only under the terms of the insurance contract. *See Culp Constr. Co. v. Buildmart Mall*, 795 P.2d 650, 653–54 (Utah 1990); *Chapman*, 2003 UT App 383, ¶ 16. Our case law has addressed the distinction between abstracts of title and title insurance. An abstract of title is defined as

> "[a] condensed history of the title to land, consisting of a synopsis or summary of the material or operative portion of all the conveyances, of whatever kind or nature, which in any manner affect said land, or any estate or interest therein, together with a

> statement of all liens, charges, or liabilities to which the same may be subject, and of which is in any way material for purchasers to be apprised. An epitome of the record evidence of title, including maps, plats, and other aids."

*Culp*, 795 P.2d at 654 (alteration in original) (quoting *Black's Law Dictionary* 10 (5th ed. 1979)). By contrast, title insurance is

> "the insuring, guaranteeing, or indemnifying of owners of real or personal property or the holders of liens or encumbrances on that property, or others interested in the property against loss or damage suffered by reason of liens or encumbrances upon, defects in, or the unmarketability of the title to the property, or invalidity or unenforceability of any liens or encumbrances on the property."

*Id.* at 653–54 (quoting Utah Code Ann. § 31A-1-301(82) (Michie 1986 & Supp. 1989) (current version at Utah Code Ann. § 31A-1-301(164) (LexisNexis Supp. 2013))). Title insurers have a statutory duty "to make a reasonable search and examination of title for the purpose of determining insurability." *Id.* at 654 (citing Utah Code Ann. § 31A-20-110(1) (Michie 1986) (current version at *id.* § 31A-20-110(1) (LexisNexis 2010))). Indeed, "[n]o title insurance policy may be written until the title insurer or its agent has conducted a reasonable search and examination of the title and has made a determination of insurability of title under sound underwriting principles." *Id.* (citation and internal quotation marks omitted). Nevertheless, this duty to perform "a reasonable search and examination" is "for the purpose of determining the insurability of title" and does not extend so far as to "impose a duty to abstract titles upon title insurance companies." *Id.*

¶10    Accordingly, "'[t]he function, form, and character of a title insurer is different from that of an abstractor.'" *Chapman*, 2003 UT App 383, ¶ 16 (quoting *Culp*, 795 P.2d at 654). "'A title insurance

company's function is generally confined to the practice of insurance, not to the practice of abstracting.'" *Id.* (quoting *Culp*, 795 P.2d at 654). "'One who hires a title insurance company does so for the purpose of obtaining the assurance or guarantee of obtaining a certain position in the chain of title rather than for the purpose of discovering the title status'" or the history of title. *Id.* (quoting *Culp*, 795 P.2d at 654). Thus, "preliminary title reports and commitments for title insurance" are considered to be "no more than a statement of the terms and conditions upon which the insurer is willing to issue its title policy." *Culp*, 795 P.2d at 653 (citation and internal quotation marks omitted). "A commitment is not an abstract of title" and therefore cannot reasonably be relied upon "as a comprehensive statement of the status of title," even by the insured. *Id.* at 655. As a result, a title insurance company generally is not subject to liability in tort[3] for omitting the kind of information in a commitment or title insurance policy that would typically be included in an abstract of title. *Id.* at 653; *Chapman*, 2003 UT App 383, ¶ 16.

¶11    In granting summary judgment, the district court concluded that the Defendants had acted as title insurers and not abstractors, emphasizing that they were not asked to prepare an abstract of title nor did they agree to prepare an abstract of title and that neither of the documents they issued purported to be abstracts of title. Rather, the Defendants agreed only to prepare and to issue the Commitment and the Title Insurance Policy. Walker, however, argues that despite what the Defendants agreed to do, the district court erred in granting summary judgment because there are genuine issues of material fact as to whether the Defendants *acted* as abstractors and, therefore, assumed the duties of abstractors in preparing and issuing the Commitment and the Title Insurance Policy.

---

[3]As we explain in more detail below, title insurance companies can be liable in tort for misrepresentations in a commitment and title insurance policy where they assume duties distinct from those of a title insurer. *See infra* ¶¶ 13–14, 26–28.

¶12     In support, Walker relies on documents, expert testimony, and depositions from Stewart Title employees and Daniel Anderson, an owner of A-O Title that discuss the importance of providing purchasers of title insurance with a report detailing any encumbrances that might affect title to the property. Walker argues that the Defendants acted as abstractors because they determined that the Access Deeds—documents that might affect title to the Bank Property—were invalid and chose to exclude them from the Commitment.

¶13     Walker's position, however, is nearly identical to the argument we rejected in *Chapman v. Uintah County*, 2003 UT App 383, 81 P.3d 761. In *Chapman*, the plaintiff argued that the defendant title insurance company "voluntarily assume[d] the role of abstractor . . . by mak[ing] legal conclusions about . . . public records"—in particular, by including language in the title insurance policy that suggested that an adjacent road was private and appurtenant to the plaintiff's newly-acquired property. *Id.* ¶¶ 2, 17 (alterations in original) (internal quotation marks omitted). The plaintiff apparently relied on information in the title insurance policy to conclude that the road was private. After purchasing the property, he gated off the road only to later discover that the road was actually public when the county ordered him to remove the gate. *Id.* ¶¶ 2–3. The plaintiff sued his title company for negligence. *Id.* The district court granted summary judgment to the title insurance company, concluding that the title insurance company was not liable in tort, *id.* ¶¶ 3–4, and on appeal, this court affirmed, reasoning that the title insurance company "ha[d] not assumed any additional role and did not act as an abstractor." *Id.* ¶¶ 17–18.

¶14     In reaching that conclusion, the *Chapman* court distinguished *Culp Construction Co. v. Buildmart Mall*, 795 P.2d 650 (Utah 1990). *See* 2003 UT App 383, ¶¶ 17–18. In *Culp*, the Utah Supreme Court concluded that the district court's grant of summary judgment was inappropriate because there was a genuine issue of material fact as to whether the defendant title insurance company had actually assumed the responsibilities of and acted as an abstractor. *Culp*, 795

P.2d at 655. Prior to closing, the plaintiff mortgage company instructed the defendant title insurance company to deposit the funds for a loan into escrow and not to release the funds to the borrower unless the status of title remained the same as represented in the commitment for title insurance. *Id.* The mortgage company specified that if the title insurance company was "unable or unwilling to promptly follow all of the above referenced instructions," it should not release the funds from escrow. *Id.* (internal quotation marks omitted). The title insurance company disbursed the funds despite the fact that a number of intervening liens had been recorded that were not listed in the commitment. *Id.* The supreme court explained that generally a commitment for title insurance may not be relied upon as a comprehensive statement of the status of the title. *Id.* at 653–55. The court reasoned, however, that when the title insurance company received the instruction not to disburse the loan proceeds unless the status of the title remained unchanged, the company "may have assumed the duties and responsibilities of an abstractor" because it was conceivably on notice that the mortgage company was relying on the commitment to determine the status of title. *Id.* at 655. The *Chapman* court explained that although the title insurance company in *Culp* may have "assumed a role separate and apart from the issuance of the title insurance commitment and policy" and acted as an abstractor by following the mortgage company's instructions, the title insurance company in *Chapman* had "not assumed any additional role and did not act as an abstractor" by simply making "a legal determination." *Chapman*, 2003 UT App 383, ¶¶ 17–18 (citing *Culp*, 795 P.2d at 655).

¶15    Here, the Buyers requested that A-O Title prepare and issue the Commitment and the Title Insurance Policy. As the district court observed, the Defendants "[were] not asked to prepare an abstract of title and did not agree to prepare an abstract of title," and the Commitment itself does not "purport to be an abstract of title." Moreover, there is nothing to indicate that the Defendants had reason to think that the Buyers were relying on either the Commitment or the Title Insurance Policy as a comprehensive

statement of the history or state of the title as opposed to "a statement of the terms and conditions upon which [the Defendants were] willing to issue [title insurance]." *See Culp*, 795 P.2d at 653 (citation and internal quotation marks omitted). For instance, Walker points to statements on Stewart Title's public website that the results of a title search "fully report all 'material objections' to title" to disclose problems "so they can be corrected." He also cites a clause in the Defendants' underwriting agreement that requires a "written report of title resulting from a complete search and examination" of title history before issuance of a title insurance policy. Finally, Walker identifies other statements from A-O Title and Stewart Title employees discussing a title insurer's role of disclosing any liens in a title insurance commitment that might affect title to the property. But Walker does not allege that the Buyers saw any of this information—let alone relied on it—before requesting the Commitment and Title Insurance Policy from the Defendants, nor does he establish that the website statements somehow modified the Commitment and the Title Insurance Policy, the Defendants' only written undertakings.

¶16   Rather, consistent with their obligations under Utah law, the Defendants reviewed public records to identify potential encumbrances or liens on the title in order to determine the extent to which they would or would not insure the Bank Property. During this process, the Defendants discovered the Access Deeds but ultimately determined that they were invalid. Whatever legal conclusion the Defendants made in the course of this determination was within the scope of the "reasonable search and examination of title for the purpose of determining insurability" required of a title insurer under Utah law and did not move them into the very distinct realm of the abstractor. *See id*. at 654. Because the Defendants did not assume the duties of an abstractor, they are not subject to liability in tort as an abstractor. Accordingly, we conclude that the district court correctly determined that there are no genuine issues of material fact as to whether the Defendants acted as abstractors rather than title insurers and appropriately

granted summary judgment in favor of the Defendants on that issue.

B.      Walker's "Separate Duty" Argument

¶17      Walker next argues that the district court erroneously granted summary judgment to the Defendants on his claims for tortious interference and negligence because the court limited its analysis to abstractor liability and did not consider his argument that the Defendants had breached another separate duty they owed to Walker. We conclude, as did the district court, that the separate duty upon which Walker's tortious interference and negligence claims both depend is simply the duty of an abstractor in a different guise. Because we have already ruled that Walker has failed to create a genuine issue of material fact to support his claim that the Defendants acted as abstractors, the district court was correct to dismiss the tort claims along with Walker's claim for abstractor liability.

1.      Tortious Interference

¶18      Walker first argues that the district court erred in granting summary judgment on his claim for tortious interference. To prevail on a claim for intentional interference with economic relations, "the plaintiff must prove that (1) the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff." *Overstock.com, Inc. v. SmartBargains, Inc.*, 2008 UT 55, ¶ 18, 192 P.3d 858. According to Walker, even if the Defendants did not act as abstractors, there is at least a question of fact as to whether the Defendants interfered with his economic relations through improper means.[4] Walker

---

[4]To establish the second element of a claim for tortious interference with economic relations, a plaintiff can show either an improper purpose or improper means. *Overstock.com, Inc. v.*

(continued...)

explains that to prove improper means, he may show that the Defendants' conduct violated an established standard in the title insurance industry. (Citing *Jones & Trevor Mktg., Inc. v. Lowry*, 2010 UT App 113, ¶ 17, 233 P.3d 538 (noting that improper means can be shown by actions "contrary to statutory, regulatory, or common law" or by the "[violation of] an established standard of a trade or profession" (citation and internal quotation marks omitted)), *aff'd*, 2012 UT 39, 284 P.3d 630.) He argues that before title companies issue insurance policies, "the established professional standard . . . requires a preliminary report listing all encumbrances that may be important." In support of this proposition, he cites expert testimony and a variety of other sources that discuss Stewart Title's internal policy of disclosing certain encumbrances to its customers before issuing a title insurance policy. This evidence, Walker contends, shows that "industry standards required that the [Commitment] should have included the [Access Deeds]," and "is distinct from the abstractor liability theory."

¶19 We conclude that the tortious interference claim cannot survive summary judgment for two reasons. First, the evidence Walker offers is legally insufficient to establish a title insurance industry standard. And second, Walker's improper means argument, if accepted, would impose the duties of an abstractor on all title insurers contrary to *Culp* and *Chapman*.

¶20 Walker has failed to establish a genuine issue of material fact regarding the existence of an industry standard. Establishing an industry standard requires more than evidence of a particular company's rules and policies. *See, e.g.*, *Wessel v. Erickson Landscaping Co.*, 711 P.2d 250, 253–54 (Utah 1985) (relying on the

---

[4](...continued)
*SmartBargains, Inc.*, 2008 UT 55, ¶ 18, 192 P.3d 858. Improper purpose requires "a showing that the actor's predominant purpose was to injure the plaintiff." *Id.* Walker does not argue that the Defendants interfered with his economic relations for an improper purpose, and we therefore do not reach the issue.

Uniform Building Code to establish an industry standard for construction of a retaining wall); *Crandall v. Ed Gardner Plumbing & Heating*, 405 P.2d 611, 612 (Utah 1965) (relying on testimony from *other* plumbers about general practices to establish that a defendant-plumber violated industry standards); *see also Wal–Mart Stores, Inc. v. Wright*, 774 N.E.2d 891, 894 (Ind. 2002) (noting that the mere existence of a company's internal corporate policy did not create a legal duty to a plaintiff). Rather, "'the standard of conduct which the community demands must be an external and objective one, rather than the individual judgment, good or bad, of the particular actor.'" *Wal–Mart Stores*, 774 N.E.2d at 895 (quoting W. Page Keeton, *Prosser & Keeton on the Law of Torts* § 32, at 173–74 (5th ed. 1984)).

¶21    The evidence Walker offers, by contrast, focuses almost exclusively on the Defendants' internal company policies, not general practices in the title insurance industry. Walker's expert, for example, stated that the "princip[al] facts" upon which he based his opinion include deposition testimony from John Holt, a Stewart Title employee, and Daniel Anderson, an owner of A-O Title; a clause from the Defendants' underwriting agreement; statements from Stewart Title's website; and the fact that the Defendants determined the Access Deeds did not need to be disclosed. Walker's brief refers to the same evidence as well as the deposition of another Stewart Title employee discussing Stewart Title's internal practices. None of this evidence suffices to establish the existence of an industry-wide standard on which to base an "improper means" claim.[5]

_____

[5]The Defendants also argue that because Walker is a stranger to the Defendants' contract with the Buyers, the Defendants cannot owe Walker a duty of disclosure absent a special relationship. (Citing *Yazd v. Woodside Homes Corp.*, 2006 UT 47, ¶ 17, 143 P.3d 283 ("A person who possesses important, even vital, information of interest to another has no legal duty to

(continued...)

¶22 Moreover, Walker's purported industry standard is inconsistent with Utah statutes and case law governing the title insurance industry. *See supra* ¶¶ 9–10. As noted earlier, Walker relies on his expert's report and evidence of Stewart Title's internal policies to argue that the "clear . . . established professional standard for title insurance work requires a preliminary report listing *all* encumbrances." (Emphasis added.) In essence, Walker argues that industry standards require that title insurers provide an accurate title history consisting of all liens, charges, or other encumbrances which are in any way material to the purchaser before issuing title insurance—an obligation that is virtually identical to the duty of an abstractor under Utah law. *See Culp Constr. Co. v. Buildmart Mall*, 795 P.2d 650, 654 (Utah 1990) (defining an "abstract of title" as a "'condensed history of the title to land, consisting of a synopsis or summary of the material or operative portion of *all* conveyances'" (emphasis added) (quoting *Black's Law Dictionary* 10 (5th ed. 1979))). In other words, Walker's argument that industry standards required the Defendants to list the Access Deeds on the Commitment or the Title Insurance Policy simply recasts title insurers as abstractors. We have already rejected this argument as contrary to *Culp* and *Chapman*. *See Culp*, 795 P.2d at 654 (explaining that a title company "did not owe a duty to abstract the title by virtue of its status as a title insurance company"); *Chapman v. Uintah Cnty.*, 2003 UT App 383, ¶ 16, 81 P.3d 761 ("[The plaintiff's] claim that [the title insurance company] is liable in tort, similar to an abstractor, for its error in representing the title in the insurance commitment and policy is not supported by our case law."). And neither Walker's evidence nor his arguments call into question in any meaningful way the continuing applicability of those cases. Consequently, the district court correctly granted the Defendants summary judgment on the tortious interference claim.

---

[5](...continued)
communicate the information where no relationship between the parties exists.").) Because we resolve the question on different grounds, we do not reach that issue.

2.      Negligence

¶23     Walker also argues that the district court erred in granting summary judgment on his negligence claim because it failed to recognize an independent basis for negligence separate from abstractor liability. According to Walker, instead of expressly identifying the Access Deeds in the Commitment and the Title Insurance Policy, the Defendants made a legal determination about the validity of the Access Deeds and decided to insure over them without disclosing their existence. In so doing, Walker argues, the Defendants undertook an act "that gave rise to a duty to Walker . . . separate and distinct from any duty related to whether the [D]efendants acted as abstractors." (Citing *Stuckman ex rel. Nelson v. Salt Lake City*, 919 P.2d 568, 573 (Utah 1996).) "In other words," Walker asserts, "by failing to disclose the existence of the [Access Deeds], the . . . Defendants did not act with ordinary care" and thereby breached a duty owed to Walker. In support, Walker cites the same evidence upon which he relied to establish abstractor liability and improper means. *See supra* ¶¶ 12, 21. According to Walker, this evidence creates an issue of material fact with respect to whether the Defendants assumed a tort duty requiring disclosure of the Access Deeds distinct from that of an abstractor.

¶24     We conclude, however, as did the district court, that the negligence claim "boil[s] down to whether . . . the nature of the [D]efendants' work in this case amounted to abstracting title." This is because the negligence claim has no merit unless tort law requires title insurers to provide an accurate title history when issuing insurance—a duty our case law imposes only on abstractors and on title companies that assume certain duties outside the context of issuing title insurance. *See Chapman*, 2003 UT App 383, ¶¶ 17–18; *see also supra* ¶¶ 13–14. But we have already determined that the Defendants did not act as abstractors by virtue of issuing title insurance, and none of the evidence Walker provides creates a genuine issue of material fact regarding whether the Defendants assumed duties distinct from those of a title insurance company as *Chapman* requires. *See* 2003 UT App 383, ¶¶ 17–18.

¶25    The fact that, after discovering the Access Deeds in the course of their title search, the Defendants analyzed the Access Deeds' legal effect and then decided to insure over them rather than identify them as exceptions to coverage on the Commitment and Title Insurance Policy does not establish that they stepped out of their title insurer role. Rather, the analytical process they engaged in is inherent in that role, which is to insure the status of title to a particular piece of property against all claims not expressly excepted. To do that, insurers naturally must assess the legal effect of any pertinent filing that a title search uncovers and then decide whether to list it as an exception to coverage or insure over it and take on the attendant risk. In fact, as we have earlier discussed, Utah law requires just such an analysis as part of the title insurance underwriting process. *See supra* ¶¶ 9–10; *see also* Utah Code Ann. § 31A-20-110(1) (LexisNexis Supp. 2013). Thus, the Defendants did not step out of their role as title insurers, as Walker asserts, but acted well within that role. Walker's contention that the Defendants had a separate duty to list the Access Deeds on the Commitment and the Title Insurance Policy despite the decision to insure over them describes the responsibility of an abstractor, not an insurer of title. Consequently, the negligence claim cannot survive summary judgment.

¶26    Walker argues that this approach would effectively render title companies immune from tort liability and cites a number of cases in which courts have found title companies liable for negligence, which he sees as supportive of his position here. *See Sevy v. Security Title Co.*, 902 P.2d 629 (Utah 1995); *Christenson v. Commonwealth Land Title Ins. Co.*, 666 P.2d 302 (Utah 1983); *Espinoza v. Safeco Title Ins. Co.*, 598 P.2d 346 (Utah 1979); *Schwartz v. Adair*, 2007 UT App 75U (mem.); *New W. Fed. Sav. & Loan Ass'n v. Guardian Title Co. of Utah*, 818 P.2d 585 (Utah Ct. App. 1991); *South Sanpitch Co. v. Pack*, 765 P.2d 1279 (Utah Ct. App. 1988). In each of these cases, however, liability was either unrelated to a title insurance commitment and policy, or under the particular facts the title company assumed duties distinct from merely issuing title insurance.

¶27     In *Sevy*, the Utah Supreme Court held a title company liable for negligently failing to perfect a security interest in connection with its contractual obligations to draft documents selling farmland and transferring water rights. *See* 902 P.2d at 631–32, 636–37. *Schwartz* involved a title company that failed to bid on a piece of property as it had agreed, *see* 2007 UT App 75U, para. 3 (mem.), and in *South Sanpitch*, a title company was found liable for failing to correctly record a deed, 765 P.2d at 1282. None of these cases premised liability on a title company's failure to report title history accurately in a title insurance commitment or policy.

¶28     Other cases where Utah courts have held title companies liable for failing to accurately report title history involve facts similar to *Culp* rather than this case. In *Christenson*, a title company reported the status of several trust deeds to a developer who had a right to the unpaid principal. *See* 666 P.2d at 304. The title company erroneously signed an acknowledgment reporting that the trust deeds had not been paid off, allowing the developer to use the deeds as collateral to finance another project. *Id.* The supreme court held that the title company was negligent because upon signing the acknowledgment, "a duty arose to use reasonable care to not mislead one whom [the title company] knew would . . . rely upon the facts as represented." *Id.* at 306. Similarly, in *New West Federal*, this court held that a title company was negligent for disbursing loan proceeds for a trust deed without reexamining the title status of the property. *See* 818 P.2d at 590. The court noted that the title company had expressly agreed not to disburse the funds unless the trust deed was "a first and paramount lien of record," so the company breached a duty by failing to discover and disclose prior liens. *Id.* at 589–90 (citation and internal quotation marks omitted). In both cases, as in *Culp,* the title companies assumed duties apart from those associated with issuing a title insurance policy.[6] As we have already discussed, *see supra* ¶¶ 24–25, Walker

---

[6]Walker also cites *Espinoza v. Safeco Title Insurance Co.*, 598 P.2d 346 (Utah 1979), which involved a title insurer that failed to

(continued...)

has failed to show that the Defendants assumed any duties analogous to those mentioned in the cases he cites.

¶29 In summary, the district court correctly concluded that Walker's claims for negligence and tortious interference "boil down to whether there is any genuine issue of material fact to suggest that the nature of the [D]efendants' work in this case amounted to abstracting title." Consequently, because Walker fails to raise any genuine issues of material fact as to whether the Defendants assumed responsibilities distinct from those of a title insurer, neither claim can survive summary judgment. Further, because our holding disposes of all Walker's tort claims, his claim for attorney fees under the third-party tort rule also fails as a matter of law. *See South Sanpitch*, 765 P.2d at 1282–83 (noting that recovery of attorney fees under the third-party tort rule requires success on an underlying tort claim).

CONCLUSION

¶30 We conclude that the district court correctly granted summary judgment to the Defendants. Because Walker fails to raise any issues of material fact as to whether the Defendants assumed any duties apart from issuing the Commitment and Title

---

[6](...continued)
discover an IRS tax lien before issuing title insurance. *See id.* at 347. The plaintiff in that case, however, failed to collect any damages for breach of contract because the company paid the tax lien, apparently honoring its insurance commitment, and the plaintiff did not raise any tort claims. *Id.* at 347–48, 349 n.7. Although the court acknowledged in a footnote that an insurer can be liable for attorney fees for breaching a duty to its insured, it also noted that "the plaintiff ha[d] not shown that [the title insurer] breached its duty" by failing to discover the tax lien. *Id.* at 349 n.7.

Insurance Policy, *Chapman* and *Culp* bar any recovery for abstractor liability, negligence, tortious interference, and attorney fees under the third-party tort rule.

———————