<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**February 19, 2015**

**TENTH CIRCUIT**

---

E. JEFFREY DONNER; JUDEE M.
DONNER,

        Plaintiffs - Appellants,

v.

        No. 13-4057

JACK NICKLAUS; JACK
NICKLAUS GOLF CLUB, LLC,

        Defendants - Appellees.

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:11-CV-00489-CW)**

---

Justin T. Toth, Ray Quinney & Nebeker P.C., Salt Lake City, Utah
(Greggory J. Savage, Ray Quinney & Nebeker P.C., Salt Lake City, Utah,
with him on the brief) for Plaintiffs-Appellants E. Jeffrey Donner and
Judee M. Donner.

Alan Bradshaw, Manning Curtis Bradshaw & Bednar LLC, Salt Lake City,
Utah (Brent V. Manning and Aaron C. Garrett, Manning Curtis Bradshaw &
Bednar LLC, Salt Lake City, Utah, and Patrick A. Shea, Patrick A. Shea,
P.C., Salt Lake City, Utah, and Jacque M. Ramos, J. Ramos Law Firm
P.L.L.C., Salt Lake City, Utah, with him on the brief) for Defendants-
Appellees Jack Nicklaus, and Jack Nicklaus Golf Club, LLC.

---

Before **BRISCOE**, Chief Judge, **KELLY**, and **BACHARACH**, Circuit
Judges.

---

**BACHARACH**, Circuit Judge.

This appeal grew out of a plan to build a luxurious golf course and development. The golf course would be designed by legendary golfer Jack Nicklaus, who would have a house in the development and serve as a member. Mr. Nicklaus joined the developer to solicit investors, lending his name in exchange for millions of dollars.

Mr. Nicklaus's participation allegedly led a married couple (Jeffrey and Judee Donner) to invest $1.5 million in the development. But, plans went awry: The developer's parent company went bankrupt, and the developer was not able to build the golf course or development. The Donners settled with the developer's parent company in its bankruptcy proceedings and sued Jack Nicklaus and Jack Nicklaus Golf Club, LLC for intentional misrepresentation, negligent misrepresentation, and violation of the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701-20 (2006). The district court dismissed the action, holding in the alternative:

1. The complaint failed to state a valid claim for relief.

2. The defendants were entitled to summary judgment because the Donners elected their remedies by entering into a settlement agreement with other parties.

On appeal, we must decide five issues:

1. **Timeliness of Claims**. The defendants argue that the tort claims are untimely under state law. But, the defendants waived this argument in district court by waiting to raise the argument in their reply brief. Because the defendants have waived the timeliness argument, we will not consider it.

2. **Interstate Land Sales Full Disclosure Act**. The district court dismissed the claims under the Interstate Land Sales Full Disclosure Act because the Donners' purchase of a charter membership did not concern a "lot." We agree, concluding that the alleged misrepresentations did not involve a specific, identifiable tract. In the absence of a "lot" (as this term is used in the statute), we affirm the dismissal of the statutory claims.

3. **Claims Involving Intentional Misrepresentation**. The district court concluded that the Donners have not adequately alleged claims involving intentional misrepresentation. We conclude that the Donners have adequately alleged misrepresentation of Mr. Nicklaus's membership status; thus, we reverse the dismissal of this claim. But, the Donners have not adequately alleged the remaining claims of intentional misrepresentation. Those claims were properly dismissed.

4. **Claims Involving Negligent Misrepresentation (Economic Loss Doctrine)**. The defendants argue that the negligent misrepresentation claims are barred by the economic loss doctrine. We agree. The charter membership agreement covers the subject matter of the dispute, and the Donners have not alleged the factual basis for a duty outside of that agreement. As a result, we uphold dismissal of the negligent misrepresentation claims.

5. **Election of Remedies**. In an alternative ruling, the district court granted summary judgment to the defendants on the ground that the Donners had elected their remedies through their settlement agreement with the developer's parent company. We disagree with the district court because the settlement agreement did not include the defendants and the Donners neither affirmed nor repudiated a contract. Thus, we reverse the summary judgment ruling.

## I.    The Donners' Investment

To address these issues, we must understand what the Donners allegedly read and relied on when they paid $1.5 million.

3

**A. The Mount Holly Club**

In 2002, a group formed, calling itself "Mount Holly Club L.L.C.," and set out to develop an exclusive private ski and golf resort in Utah. The club's showcase would be a golf course designed by legendary golfer Jack Nicklaus.

**B. Jack Nicklaus's Anticipated Role in the Development**

Beginning in 2006, the developer worked with Mr. Nicklaus to develop the golf course and market the club.

As part of this effort, the developer entered into a contract with Mr. Nicklaus's golf-course design company: The design company agreed to build the golf course, and the developer obtained the right to use the Nicklaus brand[1] and promote Mr. Nicklaus's involvement. With this right, the developer issued Mr. Nicklaus an "honorary Founder Membership" in the club.

Shortly thereafter, the developer expanded its relationship with Mr. Nicklaus by entering into a licensing agreement with another company of his, Nicklaus Golf. The licensing agreement allowed the developer to use the Nicklaus brand to advertise and promote membership in the golf club and the development.

---

[1]    The Nicklaus brand includes certain trademark rights in the name and phrase "Jack Nicklaus Golf Club™" and its Golden Bear™ logo. Aplt. App. at 69.

4

### C.    Marketing Materials

Following execution of the agreements, the developer joined Mr. Nicklaus and Nicklaus Golf to market the new venture. These marketing efforts included a press release and a brochure.

### 1.    The Press Release

The press release was issued by the developer and Nicklaus Golf. This document highlighted Mr. Nicklaus's involvement and included a quotation by Mr. Nicklaus, reflecting his enthusiastic decision to become a "founding charter member": "When I walked Mt. Holly Club, I was so captured by its potential [that] I thought through all 18 holes. In fact, I have been so impressed with the club and its management team that *I became a founding charter member*." Aplt. App. at 88 (emphasis added).

### 2.    The Brochure

After issuing the press release, the developer and the defendants created a full-color marketing brochure entitled: "Mt. Holly Club and Jack Nicklaus Invite You to Become a Charter Member." *Id.* at 105-07. Immediately below this invitation was a quotation from Mr. Nicklaus:

> Mt. Holly Club enjoys the ideal alpine setting. I knew from my first visit there that we had been given a canvas on which to design a truly spectacular golf course. I am so impressed with the Mt. Holly Club and its management team that *I became a founding charter member.* I look forward to seeing you there.

5

*Id.* at 107 (emphasis added). Immediately following that statement, the brochure stated that "Charter Memberships can be acquired for [a] $1.5 million entry fee." *Id.* (emphasis in original omitted).

**D.    The Charter Membership Agreement**

The Donners allegedly saw the press release and brochure and decided to buy a charter membership. For this charter membership, the Donners paid $1.5 million and signed a charter membership agreement.

Under this agreement, the developer issued the Donners an estate lot certificate. The certificate could eventually be redeemed for an estate lot when it became available.

**E.    The Filing of Bankruptcy and the Settlement Agreement**

The developer's parent company filed bankruptcy. With the filing of bankruptcy, the Donners settled with the parent company, obtaining a lot near the ski area and the right to trade that property for a lot in the development once it is platted. And, if the golf club and ski area are eventually developed, the Donners would be entitled to memberships.

**F.    The Donners' Lawsuit**

The Donners sued Mr. Nicklaus and Nicklaus Golf for intentional misrepresentation, negligent misrepresentation, and violation of the Interstate Land Sales Full Disclosure Act.

The central claim is that Mr. Nicklaus induced purchase of a charter membership through material misrepresentations and omissions in the marketing materials.

The district court concluded that

- the Donners had failed to state plausible tort claims,

- the Donners were not entitled to relief under the Interstate Land Sales Full Disclosure Act, and

- the Donners could not recover damages because they had already elected other remedies through settlement.

With these conclusions, the court alternatively dismissed the action under Fed. R. Civ. P. 12(b)(6) and granted summary judgment to the defendants under Fed. R. Civ. P. 56. This appeal followed.

## II.    Consideration of the Motion to Dismiss

We uphold the dismissal except on the claim involving intentional misrepresentation of Mr. Nicklaus's membership status.

### A.    Standard of Review

To survive a motion to dismiss, a complaint must contain enough factual matter to state a plausible claim. *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1196 (10th Cir. 2013). We engage in de novo review of the dismissal. *Sutton v. Utah State Sch. for Deaf and Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999).

## B. Timeliness

The defendants argue that the tort claims are untimely under Utah Code Ann. § 78B-2-305(3) (2011), which provides that "[a]n action may be brought within three years . . . for relief on the ground of fraud or mistake." This argument has been waived.

In district court, the defendants raised the timeliness argument for the first time in a reply brief. That was too late because the District of Utah does not allow parties to assert new arguments in a reply brief. *See Rios-Madrigal v. United States*, Nos. 2:08-cv-257 CW, 2:05-cr-691, 2010 WL 918087, at *3 (D. Utah Mar. 9, 2010) ("Because this argument was raised for the first time in Rios' reply brief, the argument is waived."); *see also* DUCiv R 7-1 (stating that reply memoranda "must be limited to rebuttal of matters raised in the memorandum opposing the motion"). In light of the waiver, we will not consider the defendants' argument on timeliness.

## C. Claims Under the Interstate Land Sales Full Disclosure Act

The Donners also argue that the district court erroneously dismissed their claims under the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701 *et seq.* (2006). According to the Donners, they bought a lot based on Mr. Nicklaus's fraudulent representations. We reject this argument: The statute addresses misrepresentations concerning the sale of a "lot," and Mr.

Nicklaus's alleged misrepresentations did not involve a "lot." 15 U.S.C. § 1703(a)(2) (2006).

The district court drew a similar conclusion,[2] and we engage in de novo review. *United States v. Porter*, 745 F.3d 1035, 1040 (10th Cir. 2014).

We conduct this review based on the events described in the amended complaint. There, the Donners allege that when they bought a charter membership, they were promised an estate lot certificate rather than a specific parcel of land. The Donners could redeem the certificate for a specific parcel once the land was platted and available lots were designated. But, the certificate did not refer to a specific parcel. To the contrary, the certificate imposed three limitations on a purchase:

1. The Donners could redeem the certificate within a certain time period; if the Donners chose not to "select and purchase" an available lot within that period, the certificate would expire.

2. The Donners' right to select an available lot for purchase was subject to the prior right (if any) of other charter members.

---

[2] The district court also concluded that

- the Donners had not sufficiently alleged any misrepresentations or omissions, and

- the defendants had not qualified as "developers or agents" under the statute.

We need not address these conclusions because we conclude that the Donners' purchase did not involve a "lot."

9

3.  If the Donners chose to redeem the certificate and to buy an available lot, the purchase would be "effected pursuant to a real estate purchase contract containing customary terms and conditions."

Aplt. App. at 231, 236-37.

Because the development was never completed, no lots were platted for the Donners to purchase. Thus, the Donners never had an opportunity to redeem their certificate.

The resulting issue is whether the Donners' allegations fit the statute. The statute prohibits misrepresentation "with respect to the sale . . . or offer to sell . . . any lot" that does not fall within an exemption. Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1703(a)(2) (2006). The parties disagree about whether the alleged misrepresentations pertain to a "lot."

The term is undefined in the statute, 15 U.S.C. § 1701 *et seq.* (2006). *Winter v. Hollingsworth Props., Inc.*, 777 F.2d 1444, 1447 (11th Cir. 1985). In the absence of a statutory definition, the scope is ambiguous. One can reasonably interpret the statutory reference to a "lot" to mean a specifically defined parcel of land.[3] But, one could also reasonably

---

[3]  This interpretation of the term "lot" is consistent with the definition of local officials in the pertinent county (Beaver). Beaver County's zoning ordinances defined the term "lot" as

A parcel . . . of land . . . by metes and bounds and held or intended to be held in separate lease or ownership; or a unit of land shown as a lot or parcel on a recorded subdivision map; or a unit of land shown on a plat used in the lease or sale or offer

10

interpret the statute to refer to any piece of land, whether specifically defined or not. Thus, the Donners do not question the ambiguity of the statute.

Instead, the Donners rely on a regulation adopted by the agency administering the statute (the Consumer Financial Protection Bureau). This agency interpreted the term "lot" to mean "any portion, piece, division, unit, or undivided interest in land . . . if the interest include[d] the right to the exclusive use of a specific portion of the land." 12 C.F.R. § 1010.1(b) (2007). The Donners do not question the validity of this regulatory definition. *See Chevron, U.S.A. v. Nat. Res. Def. Council*, 467 U.S. 837, 842-44 (1984). Instead, they rely on this definition.

The resulting issue is whether the Donners were promised something that fit the agency's definition of a "lot." This definition contains a string of three prepositional phrases:

---

of lease or sale of land resulting from the division of a larger tract into two (2) or more smaller units.

Zoning Ordinances of Beaver County § 10.02.060(85) (Apr. 1993). The county's subdivision ordinances provided a similar definition of "lot":

[A] parcel of real property with a separate and distance number or other designation shown on a plat or a parcel of real property delineated on an approved map of a record of survey, split or sub-parceling map as filed in the office of the County Recorder and intended as a unit for building development or transfer of ownership.

Beaver County Subdivision Ordinance ch. 10(14) (1996).

11

- "to the exclusive use"

- "of a specific portion" and

- "of the land."

The first phrase ("to the exclusive use") narrows the statute to cover representations about a unit of land available for the plaintiff's exclusive use. The following two prepositional phrases serve to define that unit of land.

The phrase "of the land" is clear. This phrase refers either to the development as a whole or to some larger area.

The regulation defines "lot" based on a "specific portion" of the land. Thus, the term "lot" must refer to a specific portion of the development or some larger area.

With this regulatory definition of "lot," the statute cannot be stretched to cover the defendants' alleged misrepresentations. Those misrepresentations concerned what the Donners would eventually receive for their investment, but did not refer to a "specific portion" of land that would be subject to the Donners' exclusive use. Thus, even if the Donners' allegations were true, they would not fit the regulatory definition of the statutory term "lot."[4]

---

[4]   The record on appeal contains a proposed plat among the Donners' settlement documents. This document does not affect our analysis. When the Donners invested $1.5 million, they acknowledged that they would receive only an estate lot certificate. Aplt. App. at 37. This certificate does

12

We are guided not only by the regulatory definition, but also by the larger statutory context. *See In re BDT Farms, Inc.*, 21 F.3d 1019, 1021 (10th Cir. 1994) (examining "the larger statutory context" to interpret the statute). The statutory prohibition is phrased in the present tense, covering misrepresentations or omissions with respect to a "lot" already in existence, not one to be designated later. Thus, a misrepresentation or omission falls under the statute only if it involves exclusive use of a specific, identifiable portion of land.

The Donners' claim does not involve a specific portion of land that was identifiable at the time of the alleged misrepresentations. In their opening brief, the Donners argue that they could select their "lot" "once the final resort [was] finalized." Plaintiffs' Opening Br. at 51-52. This argument is self-defeating: The promise could not involve a specific portion of the land if it could not have been selected until a future event took place (finalization of the plat).

The portion of land would presumably be identifiable later, when the plat was finalized. But, we know from other parts of the statute that it applies only when the portion of land is identifiable at the time of the misrepresentations. For example, the statute exempts subdivisions containing fewer than 25 "lots." 15 U.S.C. § 1702(a)(1) (2006). Under the

not constitute a legal title to a specific lot within the development. Therefore, no one could have identified the Donners' eventual lot at the time of the alleged misrepresentations.

13

Donners' interpretation, no one could determine whether the exemption applies until the development is eventually platted. If the plat ultimately contains fewer than 25 identifiable parcels ("lots"), Mr. Nicklaus's representations could be exempt from the statute. If the plat ultimately contains 25 or more identifiable parcels, Mr. Nicklaus's representations would not be exempt. One can apply the exemptions only by being able to count the lots in the subdivision at the time of the representation. *See Bodansky v. Fifth on Park Condo, LLC*, 635 F.3d 75, 83 (2d Cir. 2011) (holding that a different exemption in the statute, one covering 100 or more "lots," is based on the number of lots existing when the contract is signed); *Nahigian v. Juno-Loudon, LLC*, 677 F.3d 579, 587-89 (4th Cir. 2012) (holding that the 100-lot exemption does not include future sales of lots); *Nickell v. Beau View of Biloxi, L.L.C.*, 636 F.3d 752, 756-57 (5th Cir. 2011) (holding that the 100-lot exemption is based on the number of lots existing when the contract is signed).

Against the backdrop of the regulatory definition and statutory context, the Donners argue that their claim fits the statute's broad remedial purpose. But, "Congress did not . . . intend that [the Interstate Land Sales Full Disclosure Act] regulate all sales of real property." *Long v. Merrifield Town Ctr. L.P.*, 611 F.3d 240, 245 (4th Cir. 2010). Thus, to determine which types of real property Congress intended to cover, we assume "that the legislative purpose is expressed by the ordinary meaning of the words

14

used." *Richards v. United States*, 369 U.S. 1, 9 (1962). Applying the ordinary meaning of the words and the larger statutory context, we conclude that the alleged misrepresentations did not pertain to a "lot." That is true even if Congress had broad remedial objectives.

We hold that the Donners have not stated a valid claim under the Interstate Land Sales Full Disclosure Act. Given this holding, we affirm the dismissal of the statutory claims.

### D.    Claims Involving Intentional Misrepresentation Under State Law

In the amended complaint, the Donners assert that Mr. Nicklaus and Nicklaus Golf made three false statements:

1.    Mr. Nicklaus is a "charter member" of Mount Holly and, as a charter member, paid the $1.5 million purchase price for that membership.

2.    Mount Holly was an existing facility that had development approval and would continue to achieve certain development benchmarks.

3.    The developer had the authority to convey legal title when the Donners bought a charter membership.

The Donners also allege a failure to disclose that one of the developer's executives was a convicted felon.

We conclude that the Donners have adequately alleged intentional misrepresentation of Mr. Nicklaus's membership status. Thus, we reverse the dismissal of that claim. But, we affirm the dismissal of the remaining claims of intentional misrepresentation.

15

**1. Elements of the Claims Involving Intentional Misrepresentation**

A misrepresentation claim involves

- a representation about a material fact

- that was false

- that the defendant knew was false or recklessly made without enough knowledge

- to induce another party to act

- and the other party acted in reasonable reliance and without knowing of the falsity

- to that party's injury.

*Utah v. Apotex Corp.*, 282 P.3d 66, 80 (Utah 2012).

**2. Mr. Nicklaus's Membership Status**

The Donners allege that Mr. Nicklaus falsely represented that he was a charter member by stating: "I have been so impressed with the club and its management team that I became a founding charter member." Aplt. App. at 25. This representation allegedly influenced the Donners, who claim they spent $1.5 million for a charter membership in part because they believed Mr. Nicklaus had also paid $1.5 million for the same type of membership.

We conclude that the Donners have adequately alleged that Mr. Nicklaus misrepresented that he was a charter member. At this stage of

16

the proceedings, we look only to the amended complaint, and the Donners have adequately pleaded:

- Mr. Nicklaus represented that he was a charter member of Mount Holly.

- By stating he was a "charter member," Mr. Nicklaus implied that he had paid the $1.5 million purchase price for that membership.

- Mr. Nicklaus's representation was false because he was not a charter member and had not paid $1.5 million.

- The Donners reasonably relied on the representation by purchasing a charter membership.

a.    **Charter Membership**

The Donners have adequately pleaded that Mr. Nicklaus held himself out as a charter member.

In the brochure attached to the amended complaint, Mr. Nicklaus states that he is a "charter member" immediately between (1) inviting the Donners to "become a charter member" and (2) explaining how the Donners can acquire a "charter membership." Aplt. App. at 105-07.[5]

---

[5]    Mr. Nicklaus also says in the press release that he is a charter member. Aplt. App. at 88.

In this context, the Donners have plausibly alleged that Mr. Nicklaus held himself out as a charter member.

The defendants argue that Mr. Nicklaus's statement constitutes an opinion, which cannot serve as the basis for a claim of intentional misrepresentation. This argument is based on the first half of the statement (that Mr. Nicklaus was impressed with the Mount Holly Club and its

18

management team). The defendants contend that Mr. Nicklaus's "impression" involves an opinion rather than a fact.

The defendants are correct about Mr. Nicklaus's impressions. *See Berkeley Bank for Coops. v. Meibos*, 607 P.2d 798, 805 (Utah 1980). But Mr. Nicklaus stated more than his impressions; he stated that he was so impressed that he became a "charter member." And Mr. Nicklaus's declaration of a "charter membership" is a representation of present fact that goes beyond his opinion.

### b. $1.5 Million Purchase Price

The Donners also allege that Mr. Nicklaus implied that he had paid the $1.5 million price for a charter membership.

The marketing brochure states:

1. A charter membership costs $1.5 million.

2. Mr. Nicklaus was a charter member.

Aplt. App. at 107. Thus, a fact-finder could reasonably infer that Mr. Nicklaus was implying that he had paid the $1.5 million purchase price for his charter membership.

### c. False Representation

The Donners have also adequately pleaded that the representation was false because Mr. Nicklaus was not a charter member.

The defendants argue that Mr. Nicklaus's statement is true because he was an "honorary founding member" of Mount Holly. But, a fact-finder

19

could reasonably distinguish between Mr. Nicklaus's honorary status as a "founding member" and a charter membership. The brochure describes a charter membership based on the $1.5 million purchase price. Mr. Nicklaus's "founding membership" was "honorary," meaning he paid nothing. Though "charter membership" and "founding membership" may ordinarily be synonymous, the price difference (free versus $1.5 million) could have struck the Donners as significant.

The Donners allege in the amended complaint that they were induced to act by Mr. Nicklaus's willingness to pay $1.5 million for his charter membership. It was the purchase price, rather than the title of the membership, that allegedly influenced the Donners. Thus, the Donners have adequately pleaded falsity of the representation regarding Mr. Nicklaus's payment of the purchase price.

### d. Reasonable Reliance

The Donners have also adequately alleged reasonable reliance on Mr. Nicklaus's representation.

To determine whether reliance is reasonable, courts consider the facts. *Robinson v. Tripco Inv., Inc.*, 21 P.3d 219, 224-25 (Utah Ct. App. 2000). The Donners allege that they reasonably relied on Mr. Nicklaus's representation based on his use of the term "charter member" and his reputation for honesty and integrity. These allegations present a plausible basis for reasonable reliance.

20

The defendants contend that the reliance cannot be reasonable because:

- the Donners were sophisticated purchasers and

- the charter membership agreement would have clarified any false representations.

First, we reject the defendants' argument involving the Donners' sophistication. In Utah, plaintiffs may accept representations without investigation unless "'facts should make it apparent . . . that [they are] being deceived.'" *Robinson*, 21 P.3d at 225 (quoting *Conder v. A.L. Williams & Assocs.*, 739 P.2d 634, 638 (Utah Ct. App. 1987)).

The reasonableness of the reliance involves a fact question. In the amended complaint, the Donners did not include any facts that would have made their reliance unreasonable, regardless of their sophistication. In these circumstances, the Donners' pleading of reasonable reliance is sufficient notwithstanding their alleged sophistication.

Second, the defendants argue that

- the charter membership agreement would have clarified any false representations, and

- a party "cannot reasonably continue to rely on [initially-received false information] once true and corrected information is furnished to him."

*Mikkelson v. Quail Valley Realty*, 641 P.2d 124, 126 (Utah 1982). This argument is invalid. The agreement did not say, one way or the other, whether Mr. Nicklaus was a charter member.

21

The agreement did say that the Donners would not rely on representations by a "Company representative." Aplt. App. at 232. But, this provision does not apply to the defendants. The membership agreement defines "Company" as "Mount Holly Club, LLC," not Mr. Nicklaus or Nicklaus Golf. *Id.* at 231.

We conclude that the Donners have adequately alleged reasonable reliance notwithstanding their sophistication or the terms of the charter membership agreement. Thus, we reverse the dismissal of the claim involving intentional misrepresentation of Mr. Nicklaus's membership status.

### 3.    Remaining Claims of Intentional Misrepresentation

But, the Donners have not adequately alleged any other basis for liability involving an intentional misrepresentation.

### a.    Progress of the Mount Holly Development

The Donners allege that the defendants falsely represented that the Mount Holly development had already been approved and would continue to achieve certain benchmarks. This allegation is not plausible given the express terms of the charter membership agreement and the associate program contract.

The charter membership agreement states that

- "at the present time[,] none of the Club facilities are completed" and

22

- "the substantial majority of the Resort has not yet been developed."

Aplt. App. at 232. Thus, when the Donners signed the agreement, they should have realized that the facilities were not fully developed.

The associate program contract states that

- the defendants "make no representations concerning the . . . completeness" or "date of completion" of the Club facilities and

- "no claim shall be made by any member . . . related to the foregoing."

*Id.* at 253. Thus, when the Donners signed the associate program contract, they should have realized that the defendants were not representing completion of the facilities by any specific date.

Given the express terms of these agreements, the Donners have not adequately pleaded reasonable reliance on statements concerning the development's progress.

**b.    Legal Title to the Property**

The Donners also complain that Mr. Nicklaus did not tell the truth when he said in the marketing materials that a buyer would receive an "estate lot." The Donners regard this representation as false because "no title to an Estate Lot could [have been] conveyed at that time." *Id.* at 39, ¶ 102(d).

Even viewing these allegations favorably to the Donners, we conclude a fact-finder could not infer reasonable reliance. The problem is

23

that the charter membership agreement and accompanying certificate make clear that a charter membership does not include conveyance of property. For example, the charter membership agreement states that the Donners would receive an "Estate Lot Certificate" that could be redeemed to buy "any available lot" "pursuant to a real estate purchase contract containing customary terms and conditions." *Id.* at 236. With this written explanation, no reader could have justifiably expected immediate delivery of title to a lot.

### c. Criminal History of an Executive for the Developer

The Donners also allege that the defendants failed to disclose the criminal history of an executive for the developer. This allegation is also not plausible.

To survive the motion to dismiss on this claim, the Donners had to adequately allege a factual basis to infer that Mr. Nicklaus and Nicklaus Golf owed a duty to disclose this information. *Shah v. Intermountain Healthcare, Inc.*, 314 P.3d 1079, 1085 (Utah Ct. App. 2013).

The Donners have not adequately alleged such a duty. As we explain below, the parties' relationship is attenuated, and the Donners have not alleged a basis for a fiduciary duty or an obligation arising out of a statute or license. *See Yazd v. Woodside Homes Corp.*, 143 P.3d 283, 287 (Utah 2006) ("A person who possesses important, even vital, information of interest to another has no legal duty to communicate the information where

24

no relationship between the parties exists."). Because the Donners have not adequately alleged such a duty, we conclude this claim is not plausible.

E.   **Claims Involving Negligent Misrepresentation Under State Law (Economic Loss Doctrine)**

On the claims involving negligent misrepresentation, the defendants invoke the economic loss doctrine. We conclude that this doctrine precludes recovery for negligent misrepresentation.

Under the economic loss doctrine, a plaintiff cannot ordinarily recover economic damages for negligence when the subject matter is covered by a contract. *Reighard v. Yates*, 285 P.3d 1168, 1176 (Utah 2012). But, the economic loss doctrine does not apply when the tortfeasor incurs a duty outside of any contract. *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 221 P.3d 234, 246-47 (Utah 2009).

The general rule applies: The charter membership agreement covers the subject matter of the Donners' dispute; thus, that agreement provides the "exclusive means of obtaining economic recovery." *Reighard*, 285 P.3d at 1176. And, the Donners have not adequately alleged that Mr. Nicklaus or Nicklaus Golf incurred a duty outside of a contract.

### 1. General Rule (Subject Matter of the Dispute)

We first ask whether the charter membership agreement covers the subject matter of the dispute. If so, the general rule would preclude liability for negligent misrepresentation. *See id.*[6]

We conclude that the agreement covers the subject matter of the Donners' dispute with Mr. Nicklaus and Nicklaus Golf. The Donners' alleged damages relate to whether they received the benefit of their bargain under the charter membership agreement. As a result, that agreement provides the "exclusive means of obtaining economic recovery." *Id.*

### 2. Exception (Existence of a Duty Outside of any Contract)

We next ask whether Mr. Nicklaus or Nicklaus Golf incurred a duty outside of the charter membership agreement. If so, the doctrine would not apply because the Donners' claims would be based on a duty independent of any contract. *See Hermansen v. Tasulis*, 48 P.3d 235, 240 (Utah 2002). We conclude that the Donners have not adequately alleged such a duty.

The existence of a duty entails a question of law. *Yazd v. Woodside Homes Corp.*, 143 P.3d 283, 286 (Utah 2006). To determine whether a duty arises outside of a contract, we analyze the nature of the parties' relationship. *See id.* In general, the more attenuated the relationship, the less likely a duty exists. *Id.*

---

[6]    The general rule would apply notwithstanding the absence of privity of contract between the Donners and the defendants. *See West v. Inter-Financial, Inc.*, 139 P.3d 1059, 1063 (Utah Ct. App. 2006).

26

Even under the Donners' allegations, the parties' relationship is attenuated: The Donners have no contractual relationship with the defendants and never dealt directly with them. In the absence of a direct relationship, Utah courts have recognized an independent duty only when the defendant has incurred a fiduciary duty or an obligation to deal fairly and honestly under a statute or license. *See Hermansen v. Tasulis*, 48 P.3d 235, 240-41 (Utah 2002) (real estate agents); *West v. Inter-Financial, Inc.*, 139 P.3d 1059, 1065 (Utah Ct. App. 2006) (real estate appraisers); *see also Milliner v. Elmer Fox & Co.*, 529 P.2d 806, 808 (Utah 1974) (stating that an accountant can incur liability to a non-contracting third party when the accountant knew that his work would be relied on by a party to extend credit or assume certain obligations); *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 221 P.3d 234, 246-47 (Utah 2009) (recognizing a developer's limited fiduciary duty).

The Donners have not alleged a basis for a fiduciary duty or an obligation arising out of a statute or license. Instead, the Donners have alleged that Mr. Nicklaus is known for his integrity and trustworthiness. Though the Donners allegedly trusted Mr. Nicklaus based on these qualities, there was no relationship between the Donners and Mr. Nicklaus or Nicklaus Golf. In the absence of any relationship, Mr. Nicklaus and Nicklaus Golf had no independent duty to the Donners. *See Yazd v. Woodside Homes Corp.*, 143 P.3d 283, 287 (Utah 2006) ("A person who

27

possesses important, even vital, information of interest to another has no legal duty to communicate the information where no relationship between the parties exists."); *see also Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC.*, 221 P.3d 234, 245 (Utah 2009) ("Knowledge and expertise alone do not establish an independent duty; privity or a direct relationship is also required.").

The parties' relationship is attenuated, and Mr. Nicklaus and Nicklaus Golf have no obligations growing out of a fiduciary duty, statute, or license. In these circumstances, we conclude that neither Mr. Nicklaus nor Nicklaus Golf has incurred a duty outside the charter membership agreement.

The Donners argue that Mr. Nicklaus and Nicklaus Golf incurred an independent duty based on

- conduct preceding the contract and
- the Interstate Land Sales Full Disclosure Act.

We reject both arguments. The first argument is invalid under Utah law; and, as discussed above, the Interstate Land Sales Full Disclosure Act does not apply.

Utah courts have not confined the economic loss doctrine to wrongdoing taking place after entry into a contract. This sort of limitation would make little sense: The doctrine is designed to allow parties "to allocate risk by contract." *West v. Inter-Financial, Inc.*, 139 P.3d 1059,

28

1064 (Utah Ct. App. 2006). The parties can use a contract to allocate risks that may arise pre- or post-formation. As a result, we must apply the economic loss doctrine to conduct regardless of whether it preceded or post-dated the contract. *See Gibbons v. Hidden Meadow, LLC.*, 524 F. App'x 451, 453 (10th Cir. 2013) (unpublished) (applying Utah law) (holding that the economic loss doctrine precluded a claim involving "pre contractual disclosures" when no independent source existed for a duty);[7] *accord Holden Farms, Inc. v. Hog Slat, Inc.*, 347 F.3d 1055, 1063 (8th Cir. 2003) ("We know of no reason why the economic loss doctrine in Iowa would not cover pre-contract-formation negligent-misrepresentation claims.").

The Donners rely on *Price-Orem Inv. Co. v. Rollins, Brown & Gunnell, Inc.*, 713 P.2d 55, 59 (Utah 1986), and *Worldwide Mach., Inc. v. Wall Mach., Inc.*, No. 2:06CV130DS, 2006 WL 2666411 (D. Utah 2006) (unpublished). Reliance on these opinions is misguided.

In *Price-Orem*, a property owner hired a contractor, and the contractor entered into a contract with a surveyor. The surveyor erred in marking the property boundary, and the owner sued the surveyor for negligent misrepresentation. *See Price-Orem*, 713 P.2d at 56-57.

---

[7]     *Gibbons* is persuasive, but not precedential. *See* 10th Cir. R. 32.1(a).



Price-Orem Inv. Co. v. Rollins, Brown & Gunnell, Inc.

On appeal, the surveyor argued that the contractor was an indispensable party because the only parties to the surveying contract (the second contract) were the contractor and the surveyor. *See id.* at 59. The Utah Supreme Court rejected this argument, holding that privity of contract was not necessary for liability based on negligent misrepresentation. *Id.*

In reaching this holding, the court never mentioned the economic loss doctrine. *See id.*, *passim*. That is not surprising: None of the parties had mentioned the economic loss doctrine in their appeal briefs, and it would be another decade before the economic loss doctrine gained recognition in Utah outside of product liability cases. *See West v. Inter-Financial, Inc.*, 139 P.3d 1059, 1061 (Utah Ct. App. 2006) ("Outside of a products liability context, Utah first applied the economic loss rule in *American Towers Owners Ass'n v. CCI Mech[.], Inc.*, 930 P.2d 1182 (Utah 1996).").

Because privity was unnecessary for liability, the Utah Supreme Court never had to address the effect of the contract between the owner

and the contractor (the first contract). Instead, the court noted that the owner's claim did not depend on rights under the separate contract between the contractor and the surveyor. *Price-Orem*, 713 P.2d at 59.

Likewise, the Donners' claim does not depend on rights under any contracts between the developer and Mr. Nicklaus or Nicklaus Golf. No one suggests otherwise, for the Donners' claim of negligent misrepresentation involves the inability to obtain the benefits of their own contract with the developer.

The circumstances in *Price-Orem* were similar. There, the owner's claim involved an inability to obtain the benefit of its contract with the contractor. But, the state supreme court had not yet recognized the economic loss doctrine outside of products liability cases; the parties did not mention the doctrine in the appeal; and the Utah Supreme Court never referred to the doctrine. Thus, *Price-Orem* has no bearing on the defendants' invocation of the economic loss doctrine.

We are also unpersuaded by *Worldwide Mach.* There, a federal district court stated that the economic loss doctrine does not apply when a party is fraudulently induced to enter a contract. *Worldwide Mach., Inc. v. Wall Mach., Inc.*, No. 2:06CV130DS, 2006 WL 2666411, at *4-5 (D. Utah 2006) (unpublished). For this conclusion, the district court relied on two cases:

- *Grynberg v. Questar Pipeline Co.*, 70 P.3d 1 (Utah 2003), and

31

- *United Int'l Holdings, Inc. v. Wharf Ltd.*, 210 F.3d 1207 (10th Cir. 2000).

In *Grynberg*, the court applied Wyoming's version of the economic loss doctrine, not Utah's. *Grynberg v. Questar Pipeline Co.*, 70 P.3d 1, 10-14 (Utah 2003). As a result, *Grynberg* does not shed light on Utah law. *See BC Technical, Inc. v. Ensil Int'l Corp.*, 464 F. App'x 689, 699 n.16 (10th Cir. 2012) (unpublished) ("*Grynberg* is not relevant because it interprets Wyoming law rather than Utah law.").

The federal district court also relied on *United Int'l Holdings*, which applied Colorado's version of the economic loss doctrine. *United Int'l Holdings, Inc. v. Wharf Ltd.*, 210 F.3d 1207, 1226-27 (10th Cir. 2000). But, the Utah Supreme Court has noted its disagreement with aspects of Colorado's version of the rule:

> [T]he Association contends that we abandoned the economic loss rule as set forth in *American Towers* and expressly adopted Colorado's interpretation. We have not. Although we have agreed with Colorado regarding the independent duty analysis, we have not abandoned our own line of cases interpreting and applying the economic loss rule. Nor do we wholly adopt all of the independent duties recognized by Colorado.

*Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 221 P.3d 234, 248 (Utah 2009).

The Utah Supreme Court has never recognized an exception for claims of fraudulent inducement, and we do not regard the federal district court's unreported decision in *Worldwide Mach* as persuasive.[8]

We must apply the doctrine here, rejecting the Donners' reliance on pre-contract misrepresentations and the Interstate Land Sales Full Disclosure Act. Under the economic loss doctrine, the defendants cannot incur liability for negligent misrepresentation because the Donners' claim involves the benefit of their bargain under the charter membership agreement.[9]

**III.   Consideration of the Motion for Summary Judgment (Election of Remedies)**

In an alternative ruling, the district court granted summary judgment to the defendants on all claims. The court did so on the ground that the Donners had elected their remedies against the defendants through the settlement agreement. This ruling was erroneous.

---

[8]      The Donners also cite *MP Nexlevel, LLC v. Codale Elec. Supply, Inc.*, No. 2:08-CV-0727CW, 2010 WL 1687985 (D. Utah 2010) (unpublished), for the proposition that the economic loss doctrine does not apply to pre-contract misrepresentations. There, the district judge (who also issued the decision we are reviewing) stated that the economic loss doctrine does not apply to pre-contract misrepresentations, but gave no authority for this conclusion. *MP Nexlevel*, 2010 WL 1687985, at \*4. The Utah Supreme Court has never recognized an exception for pre-contract misrepresentations.

[9]      The economic loss doctrine does not affect the claims involving intentional misrepresentation. *See SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 28 P.3d 669, 680 n.8 (Utah 2001).

33

In considering the ruling on summary judgment, we view the evidence in the light most favorable to the Donners. *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1118 (10th Cir. 2014). Viewing the evidence in this manner, we can uphold the summary judgment ruling only if there is no genuine dispute over a material fact and the defendants establish their right to judgment as a matter of law. *Kovnat v. Xanterra Parks & Resorts*, 770 F.3d 949, 954 (10th Cir. 2014). Because election of remedies involves an affirmative defense, the defendants' burden is intensified. *See Kuhl v. Hayes*, 212 F.2d 37, 39 (10th Cir. 1954) ("An election of remedies is an affirmative defense."); *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) ("[I]f the moving party has the burden of proof, a more stringent summary judgment standard applies."). This standard requires the defendants to "establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case." *Pelt*, 539 F.3d at 1280.

The doctrine of election of remedies precludes a party from obtaining redress for an injury through two wholly inconsistent remedies. *See Cook v. Covey-Ballard Motor Co.*, 253 P. 196, 200 (Utah 1927) (stating that a party cannot pursue two remedies that are "so inconsistent that the assertion of one involves a negation or repudiation of the other"). The

34

burden of proving an inconsistency lies with Mr. Nicklaus and Nicklaus Golf. *Kuhl*, 212 F.2d at 39.

They argue that the Donners are seeking inconsistent remedies involving both affirmance and repudiation of the charter membership agreement. We disagree. Mr. Nicklaus and Nicklaus Golf have not shown either an affirmation or a repudiation of the agreement.

In settling a bankruptcy claim against the developer's parent company, the Donners agreed to accept a lot, with certain amenities, if the development was ever completed. The lot was acquired through settlement against a bankrupt debtor, not through a judgment based on a successful contract claim. The defendants have not proven that this settlement involves affirmation of a contract or that the Donners were made whole by obtaining the lot in an undeveloped tract.

Nor have the defendants proven the Donners' disaffirmance of the contract. In settling with other entities and seeking damages from Mr. Nicklaus and Nicklaus Golf, the Donners are merely trying to recoup their losses from separate parties under separate causes of action.

We addressed a similar issue in *Sade v. N. Nat. Gas Co.*, 483 F.2d 230, 234 (10th Cir. 1973), where we applied Oklahoma's doctrine of election of remedies. After a catastrophic injury, the claimant settled with Northern Natural Gas Co., releasing Northern but not its employees. *See id.* at 232. The claimant then sued Northern's employees, who successfully

defended by arguing that they were released through the settlement with Northern. *See id.* at 232-33. The claimant sued Northern for fraud. *See id.* at 233. Northern invoked the election-of-remedies doctrine, arguing that the claimant was seeking to affirm the settlement agreement after disaffirming the settlement agreement in state court. *See id.* at 234. We rejected this argument, in part because the claimant had never "disaffirmed" the settlement agreement:

> In the first place, we disagree with Northern's initial premise that in instituting the [state court] action, [the claimant] disaffirmed the . . . settlement. Rather, as we see it, in instituting the [state court] proceeding it was [the claimant's] position that the [settlement] agreement was valid and binding, but that it did not cover Northern's employees, but only Northern itself. In this regard, as earlier noted, the release made no mention of Northern's employees, and, according to [the claimant], Northern's attorneys repeatedly assured him that the release did not preclude him from suing Northern's employees. Hence, we fail to see just how [the claimant] was disaffirming the release when he sued Northern's employees.

*Id.* at 234-35.

Similarly, the Donners did not disaffirm the charter membership agreement by suing Mr. Nicklaus or Nicklaus Golf. Like the claimant in *Sade*, the Donners did not believe they had been made whole when they settled with the developer. Thus, the Donners—like the claimant in *Sade*—sued other parties for fraudulently inducing entry into the contract. Like the panel in *Sade*, we do not regard this fraud action as "disaffirmance" of the contract.

36

The contract was not "affirmed" through receipt of a lot worth less than $1.5 million or "repudiated" through the assertion of tort claims. In these circumstances, the election-of-remedies doctrine does not apply. *See Angelos v. First Interstate Bank of Utah*, 671 P.2d 772, 778 (Utah 1983) (concluding that "[t]he doctrine of election of remedies is inapplicable . . . because [the claimant] is not seeking or obtaining 'double redress for a single wrong'"). Because the election-of-remedies doctrine is inapplicable, the district court erred in granting summary judgment to Mr. Nicklaus and Nicklaus Golf.

Because the Donners are not precluded from pursuing tort remedies, we reverse the award of summary judgment.

## IV. Conclusion

In conclusion, we reverse (1) the dismissal of the claim involving intentional misrepresentation of Mr. Nicklaus's membership status, and (2) the award of summary judgment to Mr. Nicklaus and Nicklaus Golf. Accordingly, we remand to the district court for further proceedings on the Donners' claim relating to intentional misrepresentation of Mr. Nicklaus's membership status. But, we affirm the dismissal on the claims involving (1) violation of the Interstate Land Sales Full Disclosure Act, (2) intentional misrepresentations or omissions involving progress of the development, availability of legal title, and failure to disclose an executive's criminal history, and (3) negligent misrepresentation.