**2025 UT App 64**

# THE UTAH COURT OF APPEALS

LISA P. MINER,
Appellee,
*v.*
JOHN E. MINER,
Appellant.

Opinion
No. 20230278-CA
Filed May 8, 2025

Fifth District Court, St. George Department
The Honorable Jay Winward
No. 174500373

Rodney R. Parker, Attorney for Appellant

N. Adam Caldwell and G. Michael Westfall,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN D. TENNEY concurred.

HARRIS, Judge:

¶1     After years of post-divorce wrangling, John E. Miner and
Lisa P. Miner engaged in mediation and agreed to settle their
differences, including a dispute about the amount of alimony John
owed Lisa.[1] As part of their settlement, they agreed to the entry of
a modified decree of divorce. Just days after the modified decree
was entered, however, Lisa remarried. John then filed a motion to
set aside the modified decree, asserting that Lisa fraudulently
failed to disclose to him information regarding the state of her

---

1. As we did in our first opinion involving these parties, we refer
to them here by their first names, with no disrespect intended by
the apparent informality. *See Miner v. Miner*, 2021 UT App 77, ¶ 2
n.2, 496 P.3d 242.

romantic relationship at the time of the mediation. The district court denied John's motion and awarded Lisa attorney fees, and John appeals those rulings. We affirm the court's order denying John's motion to set aside the decree, but we reverse part of the court's attorney fees ruling and remand the case to the district court for further proceedings.

BACKGROUND

¶2      John and Lisa were married in 1997, while John was in medical school. During the marriage, John developed a successful anesthesiology practice, and over time, the family came to earn, in total, around $1 million per year. John maintained a heavy and "erratic" work schedule to obtain this income, and Lisa chose to devote most of her time to raising their four children.[2]

¶3      In 2017, Lisa filed for divorce, and the case proceeded to a four-day bench trial. After the trial, the court made findings and conclusions, and after some initial post-trial motions, the court amended some of its findings and entered a divorce decree (First Decree).[3] Among other things, the First Decree ordered John to pay Lisa $18,690 per month as alimony, an obligation that would "terminate upon the death of either party, or upon [Lisa's] remarriage or cohabitation." The First Decree also allowed John to raise "the issue of any additional tax obligations that may occur as a result of audits of tax returns for years during the marriage." At the time the First Decree was entered, the parties had an

---

2. For a more fulsome recitation of the facts underlying the parties' divorce, we refer the reader to our previous opinion. *See id.* ¶¶ 2–10. In this opinion, we refer to those facts only as necessary to set up the issues germane to this appeal.

3. John appealed various aspects of the First Decree; in our previous opinion, we largely affirmed the First Decree, but we reversed certain discrete aspects of it and remanded the case for further proceedings. *See id.* ¶ 111.

unpaid tax obligation in an amount that had not yet been ascertained. After the entry of the First Decree, that obligation was determined to be approximately $660,000.

¶4      Only a few months after entry of the First Decree, John filed a petition to modify, requesting a reduction of his alimony and child support obligations based on an asserted material change in circumstances—in particular, he claimed a 45% reduction in his annual income. While that petition was pending, John filed a separate motion asking for an allocation of the newly quantified tax obligation. On that motion, the district court ruled that the tax obligation was a marital debt, and it allocated that debt equally to both parties, with the exception of certain late filing penalties that were allocated only to John. Later, John amended his petition to modify, claiming an even greater reduction in his income; with this amendment, John also requested a modification to the court's child custody order.

¶5      On September 7, 2022, the parties participated in a mediation that was intended to address all their pending post-divorce issues.[4] At the time of the mediation, John estimated that the tax obligation had grown to $893,000, while John's monthly alimony obligation remained $18,690. The mediation was successful: at the end of the day, the parties entered into a settlement in which John agreed to assume the entirety of the parties' tax obligation and Lisa agreed to accept just $1,000 (instead of $18,690) in monthly alimony. About two weeks later, on September 23, the court entered a modified decree of divorce (Modified Decree) that reflected the parties' mediated settlement.

---

4. John asserts that the central issues in the mediation were the division of the shared tax liability and his request for modified alimony. Although the mediation covered a broader array of post-divorce issues between the parties, for purposes of our analysis we need provide background only for the alimony and tax liability issues.

¶6     Just one week later, on September 30, Lisa remarried, an event that terminated John's alimony obligation. John claims that he learned of Lisa's intent to marry only after the fact, when he received a copy of a text message that Lisa had sent to one of the parties' children indicating that she had wed. According to John, this post-wedding text was the first indication Lisa had given to John or to any of their children that she had even been involved in the sort of relationship that could culminate in marriage.

¶7     A few weeks later, John filed a motion—grounded in rule 60(b) of the Utah Rules of Civil Procedure—asking the court to set aside the Modified Decree, asserting that Lisa had fraudulently failed to disclose to John, prior to or during the mediation, the advanced nature of her romantic relationship and her apparently imminent plans to marry. The thrust of John's argument was that during the mediation, Lisa had leveraged her willingness to agree to a reduction of alimony to obtain John's agreement to assume her share of the tax obligation, all while knowing that she would soon marry and thereby terminate the alimony obligation anyway. In other words, according to John, Lisa used bad faith to trade a relatively valueless reduction in alimony for a substantial reduction in her tax liability, and in doing so "brazenly misled him" as to the terms of their settlement agreement. Lisa opposed John's motion, asserting that she had not been "secretly engaged" to be married at the time of the mediation and arguing that, even if she had been engaged, she was under no legal duty to disclose to John the nature of her relationship. Lisa also asked the court to order John to pay the attorney fees she incurred in defending against John's motion; she did not, however, identify a statutory provision or other specific basis for such an award.

¶8     After holding an initial hearing on the matter, the district court determined that an evidentiary hearing was necessary, and it allowed the parties to engage in expedited discovery in advance of that hearing. At the evidentiary hearing, John presented text messages that Lisa had produced during the discovery period;

these messages were between Lisa and her now-husband (Jeff[5]), were written in the months leading up to the mediation, and contained various romantic and sometimes sexual messages that John asserted indicated that Lisa and Jeff had been in an advanced marriage-like romantic relationship. John also presented text messages that Lisa had sent to other friends, including pictures of wedding rings Lisa sent to a friend one month before mediation. And John testified at the hearing, telling the court that if he had known Lisa "was on the cusp of remarriage," he would not have entered into the settlement on the agreed-upon terms.

¶9    Lisa testified at the hearing too, and she told the court that she did not know she was going to marry Jeff until he proposed to her on September 29, three weeks after the mediation. Lisa described her romantic texts with Jeff as "a lot of teasing" and explained that she and Jeff "joke around all the time." And she testified that at the time of the mediation, her relationship with Jeff was "evolving" and that she didn't "know where [it was] going to go." When asked to explain how it came to be that she got married just three weeks later, she responded that she got married "[b]ecause [Jeff] finally asked" her. When John's attorney pressed her on whether she had bargained for her reduced tax liability with the knowledge that she would be remarried soon after the mediation, Lisa responded, "I didn't know if [Jeff] was going to be a husband at that point. I loved him but I didn't know if . . . ." John's attorney interjected, "And you wanted to marry him," to which Lisa responded, "I was hoping, but I didn't know."

¶10    After the hearing, the district court made an oral ruling—later memorialized in written findings of fact and conclusions of law—denying John's rule 60(b) motion. The court concluded that Lisa did not owe a duty to John "to disclose the details of her dating relationship at the time of mediation." The court "agree[d] with [John] that he made certain concessions at mediation in exchange for taking on additional tax liability," but the court found "no evidence of a plot, by [Lisa], to enter into mediation in

---

5. A pseudonym.

bad faith." Specifically, the court found that "[Lisa] had no plans to marry as of September 7th," that "there [was] no evidence to suggest that [Lisa] was engaged" at that time, and that Lisa did not have "some sort of inner knowledge of a pending marriage" that rendered Lisa's negotiations at the mediation "a sham." The court concluded that there was "no fraud to [John], especially when [Lisa] was never asked about any possible dating relationship(s)" by John or his attorney. The court added that "given the amount of time the parties ha[d] been separated and then divorced, Lisa's dating relationship(s) is something that [John] should have been wondering about, and something that [he] could have asked [her] about prior to mediation."

¶11  The court also awarded Lisa her attorney fees that she incurred in defending against John's motion. In its written order, the court did not reference a statute as the source of its authority to make the award; indeed, the court's entire ruling on this point was as follows: "As it relates to the matter of attorney's fees, this court awards fees based on equitable doctrines in a divorce setting. Thus, the court finds that, as the prevailing party in this matter, Lisa be awarded her attorney's fees in this matter."

ISSUES AND STANDARDS OF REVIEW

¶12  John now appeals and raises two issues for our review. First, he argues that the district court erred by denying his motion to set aside the Modified Decree. As a general matter, "we review a district court's denial of a rule 60(b) motion under an abuse of discretion standard." *Bodell Constr. Co. v. Robbins*, 2014 UT App 203, ¶ 5, 334 P.3d 1004 (cleaned up). More specifically, however, "in the context of a denial of a rule 60(b) motion, we review a district court's findings of fact under a clear error standard of review, while we review a district court's conclusions of law for correctness, affording the [district] court no deference." *Id.* (cleaned up). And as directly relevant here, "[t]he determination of whether a legal duty exists" in the fraudulent nondisclosure

context "is a purely legal question." *Yazd v. Woodside Homes Corp.*, 2006 UT 47, ¶ 14, 143 P.3d 283.

¶13 Second, John challenges the attorney fees award that the court made to Lisa. We review a district court's decision to award attorney fees "for an abuse of discretion, but review its underlying legal conclusions for correctness." *Tilleman v. Tilleman*, 2024 UT App 54, ¶ 29, 549 P.3d 65 (cleaned up), *cert. denied*, 558 P.3d 85 (Utah 2024).

ANALYSIS

I. The Rule 60(b) Motion: Fraudulent Nondisclosure

¶14 John first challenges the district court's order denying his motion to set aside the Modified Decree. John grounded his motion in rule 60(b) of the Utah Rules of Civil Procedure, and he asserted that Lisa had defrauded him by failing to disclose, at or before the mediation, the status of her dating relationship. The court denied John's motion, concluding (among other things) that Lisa had no duty to disclose to John the details or status of her dating relationship. For the reasons discussed below, we affirm the court's denial of John's motion.

¶15 Rule 60(b) authorizes a district court to grant relief from "a judgment, order, or proceeding" when a party, upon timely motion, demonstrates that it is entitled to relief under any one of six rule subsections. *See* Utah R. Civ. P. 60(b); *Peterson v. State*, 2024 UT App 159, ¶ 22, 559 P.3d 993.[6] In this case, John invokes rule

---

6. In most contexts, litigants seeking relief under rule 60(b) of the Utah Rules of Civil Procedure must also show that they have a "meritorious defense" in the underlying case. *Peterson v. State*, 2024 UT App 159, ¶ 23, 559 P.3d 993 (cleaned up). That is, to be successful, the movant must typically "set forth specific and sufficiently detailed facts which, if proven, would have resulted

(continued…)

60(b)(3), which allows relief upon a showing of "fraud, . . . misrepresentation, or other misconduct." Utah R. Civ. P. 60(b)(3). A litigant invoking rule 60(b)(3) must "clearly substantiate the claim of fraud" through "clear and convincing proof," and must demonstrate that the "challenged behavior . . . substantially . . . interfered with the aggrieved party's ability fully and fairly to prepare for and proceed at trial." *Zurich N. Am. v. Matrix Service, Inc.*, 426 F.3d 1281, 1290 (10th Cir. 2005) (cleaned up).[7]

---

in a judgment different from the one entered." *Judson v. Wheeler RV Las Vegas, LLC*, 2012 UT 6, ¶ 10, 270 P.3d 456 (cleaned up). But a showing of a meritorious defense is not always required; for instance, litigants need not allege a meritorious defense when their motion is grounded in rule 60(b)(4). *See id.* ¶ 15 (explaining that a motion under rule 60(b)(4) does not require a showing of a meritorious defense because a court's "lack of jurisdiction is alone sufficient to void its judgment"). We are not aware of any Utah caselaw addressing whether litigants invoking rule 60(b)(3), as John does here, must allege facts that, if true, would constitute a meritorious defense to the underlying case; there is an argument to be made that a litigant who can show that a judgment was procured by fraud will necessarily have demonstrated a defense to the underlying case. But we need not further consider this question, both because it is not briefed by the parties before us and because—as discussed herein—we affirm the denial of John's motion on the basis that John cannot show that the judgment in question was procured by fraud.

7. "Interpretations of the Federal Rules of Civil Procedure are persuasive where the Utah Rules of Civil Procedure are substantially similar to the federal rules." *Tucker v. State Farm Mutual Auto. Ins. Co.*, 2002 UT 54, ¶ 7 n.2, 53 P.3d 947 (cleaned up); *accord Robinson v. Taylor*, 2015 UT 69, ¶ 10, 356 P.3d 1230 ("We may also rely on interpretations of similar federal rules by federal courts to assist our own interpretation."). That is the case here, given that the text of the federal rule quite closely matches the text

(continued…)

¶16 In this case, the "fraud . . . , misrepresentation or other misconduct" to which John points is fraudulent nondisclosure. That is, John asserts that the qualifying act that brings this case within the ambit of rule 60(b)(3) is Lisa's commission of fraudulent nondisclosure, a common-law tort. "To prevail on a claim for fraudulent nondisclosure, a plaintiff must prove by clear and convincing evidence that (1) the defendant had a legal *duty* to communicate information, (2) the defendant *knew* of the information he failed to disclose, and (3) the nondisclosed information was *material*." *Jensen v. Cannon*, 2020 UT App 124, ¶ 16, 473 P.3d 637 (cleaned up). John asserts that Lisa committed this tort by failing to disclose to him, during or prior to the mediation, the status of her dating relationship.

¶17 Clearly, Lisa knew the status of her dating relationship during the mediation, and we assume for purposes of our analysis that this information would have been material to John's thought process as he worked through whether, and on what terms, to settle his differences with Lisa. But we agree with Lisa, and with the district court, that under these circumstances Lisa had no *common-law* duty to disclose any such information to John.

¶18 In this context, "[t]he determination of whether a legal duty exists . . . is a purely legal question" that is to be decided by the court. *Yazd v. Woodside Homes Corp.*, 2006 UT 47, ¶ 14, 143 P.3d 283. Yet the inquiry is a multi-faceted, case-specific one that requires the court to consider "all the circumstances of the case." *See Elder v. Clawson*, 384 P.2d 802, 804 (Utah 1963) (cleaned up). As described by our supreme court, it is "the structure and dynamics of the relationship between the parties [that] gives rise to the duty." *Yazd*, 2006 UT 47, ¶ 15. In assessing whether a duty exists in this context, a court must examine "the legal relationships between the parties" and then undertake an "analysis of the duties created by these relationships." *Id.* (cleaned up). "A relationship that is highly attenuated is less likely to be

---

of our rule. *Compare* Fed. R. Civ. P. 60(b), *with* Utah R. Civ. P. 60(b). Accordingly, we look to federal cases for guidance.

accompanied by a duty than one, for example, in which parties are in privity of contract." *Id.* ¶ 16. Among other factors, the court should consider the parties' relative "[a]ge, knowledge, influence, bargaining power, sophistication, and cognitive ability." *Id.* "Where a disparity in one or more of these circumstances distorts the balance between the parties in a relationship to the degree that one party is exposed to unreasonable risk, the law may intervene by creating a duty on the advantaged party to conduct itself in a manner that does not reward exploitation of its advantage." *Id.* Our supreme court summarized the inquiry by stating that "[l]egal duty," in this context, "is the product of policy judgments applied to relationships." *Id.* ¶ 17.[8]

¶19 In this case, as in most such cases, both sides can find factors that weigh in their favor. John argues that Lisa had an advantage because "[a]t the mediation, Lisa had exclusive access to information that John could not otherwise obtain, and that information pertained directly to the matters being negotiated." Indeed, John asserts that the existence and status of Lisa's

---

8. It is worth noting that the duty analysis in the fraudulent nondisclosure context is much different than the duty analysis our supreme court has articulated in negligence cases. *See D.W. v. FPA Sandy Mall Assocs.*, 2024 UT 32, ¶¶ 23, 27, 554 P.3d 1052; *B.R. ex rel. Jeffs v. West*, 2012 UT 11, ¶¶ 5, 23, 275 P.3d 228. In the negligence context, duty determinations are not case-specific but, instead, "should be articulated in relatively clear, categorical, bright-line rules of law applicable to a general class of cases." *Jeffs*, 2012 UT 11, ¶ 23 (cleaned up); *see also Davis v. Wal-Mart Stores Inc.*, 2022 UT App 87, ¶¶ 18, 25, 514 P.3d 1209 (stating that "case-specific analyses are unwarranted at the duty stage of the negligence inquiry" and that "a court should not engage in a fact-intensive analysis regarding the question of duty" (cleaned up)). By contrast, in the fraudulent nondisclosure context the test is fact-intensive and case-specific. *See Yazd v. Woodside Homes Corp.*, 2006 UT 47, ¶ 16, 143 P.3d 283. In this case, both parties agree that the duty question is governed by *Yazd* and similar cases, and no party asks us to apply the categorical test articulated in *Jeffs*.

romantic relationship was very important to the settlement negotiations, given that one of the major items on the negotiating table was John's ongoing alimony obligation that could terminate upon Lisa's remarriage. John also argues that even in a divorce proceeding, parties "owe high duties of candor and transparency to one another," and he points out that here, John and Lisa were "married for over 20 years and had four children together" and that "[t]hey were not strangers entering a negotiation."

¶20　Lisa, for her part, argues that "[t]here are few relationships more 'attenuated' than the relationship" that existed between her and John at the time of the mediation: they were divorced former spouses who were not on speaking terms and who had been acrimoniously litigating against each other for at least five years. And Lisa asserts that there "is nothing in the record to suggest that John and Lisa [were] not on equal footing as it relate[d] to age, knowledge, influence, bargaining power, sophistication, and cognitive ability." As for John's claim that he could not have otherwise obtained information regarding the status of her relationship, Lisa argues that John "could have learned of [her] dating life if he had asked—whether formally or informally."

¶21　On the record before us, Lisa has the better of the argument. John and Lisa were litigation opponents who were engaged in an arms-length negotiation to settle a number of interrelated issues. Both parties were represented by counsel and both were experienced litigants. The parties have not pointed us to anything in the record that suggests that there was an age or sophistication disparity that disadvantaged one party relative to the other. Nor is there anything in the record to suggest that the parties were in a fiduciary or confidential relationship with each other. Indeed, the opposite is true: these parties were (and still are) litigation adversaries with inherently contrary interests.

¶22　Our conclusion in this regard is bolstered by the realities of the situation. As Lisa's litigation opponent, John had ample tools at his disposal that he could have used to obtain information relevant to the actual value of Lisa's proposed alimony reduction.

Our rules of civil procedure apply in this situation, and they define the scope of each party's disclosure obligations to the other. Certain information must be disclosed to the other party, even without a request. *See* Utah R. Civ. P. 26(a)(1), (d); *id.* R. 26.1. Parties also possess the ability to make specific requests for additional information, including interrogatories and requests for depositions, documents, and admissions. *See id.* R. 30; *id.* R. 33; *id.* R. 34; *id.* R. 36. And parties may seek judicial assistance, and even sanctions, in enforcing their right to obtain information to which they are entitled. *See id.* R. 37.

¶23    There is no indication, in the record submitted to us, that John was prevented from seeking information, prior to the mediation, about Lisa's relationship status. Nor is there any indication that John made any request to Lisa on the subject, let alone that Lisa failed to timely or accurately respond to one. Had he made a timely request and had Lisa failed to adequately respond to it, the circumstances may well be materially different.[9] *Cf. Schultz v. Butcher*, 24 F.3d 626, 630 (4th Cir. 1994) (holding that "an adverse party's failure, either inadvertent or intentional, to produce such obviously pertinent requested discovery material in its possession is misconduct under the meaning of Rule 60(b)(3)").

---

9. Indeed, in such a situation, Lisa would have been in violation of the discovery rules, and John would have been able to seek redress under those rules. *See* Utah R. Civ. P. 37. But it remains an open question in Utah whether, in that situation, John would have *also* been able to seek redress against Lisa for violation of a *common-law* duty. *See Jensen v. Cannon*, 2020 UT App 124, ¶ 64, 473 P.3d 637 (Harris, J., concurring) (noting that the court in that case did not need "to determine whether the legal duty to communicate information described in the first element of" the fraudulent nondisclosure tort "includes discovery disclosure obligations imposed by rule 26 of the Utah Rules of Civil Procedure" (cleaned up)). Here, however, there is no indication that Lisa violated any rule-based discovery obligation, so the question presented (and answered) here is one step removed from the question referred to (but not answered) in *Jensen*.

As John argues (and as we assume for purposes of our analysis), the likelihood of the recipient spouse entering into a marriage or cohabitation relationship is almost definitionally relevant in a negotiation about the value of a future alimony award. As an experienced litigant, John knew (or at least should have known) this, and his own failure to protect himself by using established litigation discovery rules to request information he now insists would have been material is a major factor militating against imposition of a common-law duty here.

¶24    Moreover, imposition of a *common-law* duty to disclose material information to one's litigation opponent would upset settled expectations around litigation and would serve to transform garden-variety discovery disputes into torts. On this point, John cites no case where a court has found a *common-law* duty to disclose between litigation opponents. And for good reason: the cases in which our courts have recognized a duty to disclose generally involve individuals who are not on equal footing with the other party and who have no other means of obtaining the relevant information. *See Yazd*, 2006 UT 47, ¶¶ 11, 14; *Elder*, 384 P.2d at 804.

¶25    For all of these reasons, we decline John's invitation to impose a common-law disclosure duty in this situation, and we hold that the scope of litigants' disclosure duties is generally defined by the rules of civil procedure and not, in the first instance, by the common law. The district court thus correctly determined that Lisa owed no common-law disclosure obligation to John, and did not err in concluding, on that basis, that John could not demonstrate that the Modified Decree had been obtained by fraud. We therefore affirm the court's order denying John's motion to set aside the Modified Decree.

## II.  Attorney Fees

¶26    John also contests the district court's award of attorney fees to Lisa. The relevant subsection of the statute governing awards of fees in family law cases provides, in relevant part, that "in any

action to establish an order of custody, parent-time, child support, alimony, or division of property in a domestic case, the court may order a party to pay the costs, attorney fees, and witness fees, including expert witness fees, of the other party to enable the other party to prosecute or defend the action." Utah Code § 30-3-3(1) (2022) (referred to herein as "subsection (1)," and now codified, as amended, at Utah Code section 81-1-203(1)).[10]

---

10. Neither Lisa's request for attorney fees nor the district court's ruling awarding them specifically invoked the family law attorney fees statute. But both parties, in their briefing, assume that the district court grounded its ruling in that statute. In making its ruling, the court mentioned "equitable doctrines," but it then stated that "as the prevailing party in this matter, . . . Lisa [is] awarded her attorney's fees." The reference to the "prevailing party" may be a reference to subsection (2) of the statute, which authorizes an award of fees where a party succeeds in an action "to *enforce* an order of custody, parent-time, child support, [or] alimony." Utah Code § 30-3-3(2) (2022) (emphasis added). Subsection (1), by contrast, authorizes an award of fees where a party seeks "to *establish*" one of the orders specified in the statute and demonstrates financial need (among other things). *Id.* § 30-3-3(1) (emphasis added). These two subsections serve distinct purposes and are governed by separate legal standards. *See Tilleman v. Tilleman*, 2024 UT App 54, ¶¶ 76, 80, 83, 549 P.3d 65, *cert. denied*, 558 P.3d 85 (Utah 2024) (reversing an award of fees because the district court failed to "distinguish the fees that fall under subsection (1) and subsection (2)" and failed to "apply the corresponding legal standard to each group of fees," and explaining that "[t]he differing standards of the two subsections are attributed to the different purposes each subsection serves" and that "subsection (1) does not apply a 'substantially prevailed' standard"). To the extent that the district court here was attempting to ground its award in subsection (2) of the statute, that was error because the relevant proceeding was not one to *enforce* a court order. We follow the parties' lead in presuming

(continued…)

¶27 John challenges the award of fees under this provision on two grounds. First, he argues that his motion to set aside the Modified Decree under rule 60(b) was not an action "to establish an order of custody, parent-time, child support, alimony, or division of property in a domestic case." (Quoting *id*. § 30-3-3(1).) And second, John argues that the district court did not make the required findings concerning Lisa's ability "to prosecute or defend the action." (Quoting *id*.) We reject John's first argument, but on his second point, we agree that the district court did not make the findings required under the statute. We therefore reverse the award of fees and remand the matter to the district court for an analysis of whether Lisa demonstrated a need for the requested fees and whether John had the ability to pay them.

¶28 On John's first point, the primary tension is whether John's motion to set aside the Modified Decree can be fairly characterized as an "action to establish" one of the orders specified in the statute. John describes his motion as a "challenge to a settlement agreement based on fraud," and as a result, he argues that his motion does not constitute an action "to establish" any order. In one sense, John's motion to set aside the Modified Decree was an attempt to *dis*-establish the Modified Decree; if John had prevailed on his motion, the Modified Decree would have been vacated. But more broadly, John's motion represents the first procedural step toward establishing a new modified divorce decree. And if John had prevailed in having the Modified Decree set aside, the First Decree would then have been reinstated and the parties would have been placed back in the position they were in on the day of their mediation: litigating over the outstanding post-divorce motions, including John's petition to modify the terms of the First Decree. Thus, the effect of John's motion, had it been granted, would have been to re-establish the First Decree and reinstate the litigation to modify it. Stated another way, John's ultimate goal—toward which his motion to set aside was an important step—was to establish a new divorce

that—to the extent that the court was referencing any statute—it was referencing subsection (1).

decree between the parties with different terms regarding, at a minimum, alimony and tax obligations. Under these circumstances, we conclude that John's rule 60(b) motion is fairly characterized as a crucial procedural step in his effort "to establish an order of custody, parent-time, child support, alimony, or division of property in a domestic case." *Id.*

¶29 This conclusion is consistent with the rather broad text of the governing statute, which authorizes an award of fees in "*any action* to establish an order." *See id.* (emphasis added). "We must interpret the statutory language according to the plain meaning of its text." *O'Hearon v. Hansen*, 2017 UT App 214, ¶ 24, 409 P.3d 85 (cleaned up); *see also In re adoption of Baby E.Z.*, 2011 UT 38, ¶ 15, 266 P.3d 702 ("Under our established rules of statutory construction, we look first to the plain meaning of the pertinent language in interpreting the statute." (cleaned up)). And in this specific context, the plain meaning of the term "any action" is broad enough to include John's motion to set aside the Modified Decree. *See Graves v. North E. Services, Inc.*, 2015 UT 28, ¶ 52 & n.4, 345 P.3d 619 (discussing the "broad, encompassing import of" the word "any" and collecting cases interpreting the term broadly); *Camp v. Office of Recovery Services*, 779 P.2d 242, 247 (Utah Ct. App. 1989) ("An action means any legal proceeding in a court for the enforcement of a right; any proceeding for the purpose of obtaining such a remedy as the law allows; any judicial proceeding, which, if conducted to a termination, will result in a judgment." (cleaned up)). Thus, in this situation, subsection (1) of the governing statute is applicable to John's motion to set aside.

¶30 But that is not the end of the analysis. In awarding fees under subsection (1), district courts must exercise their discretion appropriately, and that exercise must include, among other things, an assessment of the parties' financial circumstances. Indeed, while this provision "empowers a court to use its sound discretion in determining whether to award costs based on need and ability to pay, the award or denial of such fees must be based on evidence of the financial need of the receiving spouse, the ability of the other spouse to pay, and the reasonableness of the

requested fees." *LeFevre v. Mackelprang*, 2019 UT App 42, ¶ 39, 440 P.3d 874 (cleaned up). Indeed, "[f]ailure to consider these factors is grounds for reversal on the fee issue." *Wilde v. Wilde*, 969 P.2d 438, 444 (Utah Ct. App. 1998). And we have held that when a court "decide[s] to award fees, it must make detailed findings of fact supporting its determination." *Connell v. Connell*, 2010 UT App 139, ¶ 27, 233 P.3d 836.

¶31 In this case, the district court's award of fees did not include any analysis of Lisa's financial need, John's ability to pay, or the "reasonableness of the requested fees." *Wilde*, 969 P.2d at 444 (cleaned up). The court merely awarded fees to Lisa "based on equitable doctrines in a divorce setting" and concluded that "as the prevailing party in this matter, . . . Lisa [is] awarded her attorney's fees." This finding fails "to consider [the above] factors" and is, therefore, subject to reversal. *Id.* Accordingly, we vacate the court's fee award on this basis, and we remand the case to the district court so that it may undertake the required analysis and make the necessary findings, whatever the outcome of that analysis might be.[11]

---

11. Lisa argues that the district court, given its long experience with these parties over several years, was aware of their financial circumstances, and she argues that this could have provided the court with a basis upon which to ground its fee award. This may or may not be the case. But "we do not think it is incumbent on a district court to comb through the record to find evidence of a party's need. Rather, the party to be awarded fees has the burden to submit that evidence or at least point the court to that evidence and ask that the court utilize that evidence to determine need." *Lobendahn v. Lobendahn*, 2023 UT App 137, ¶ 45, 540 P.3d 727. And in any event, when a district court awards fees under subsection (1), the court must make specific findings of fact supporting its award. *See Connell v. Connell*, 2010 UT App 139, ¶ 27, 233 P.3d 836. The court did not do so here.

CONCLUSION

¶32  Lisa and John were adverse litigants during their settlement negotiation, and neither of them had a fiduciary or confidential obligation to each other. John did not take the opportunity to ask Lisa, during the discovery process, to provide information regarding the status of her romantic relationship, and he does not assert that Lisa violated any discovery or disclosure rules. Under these circumstances, Lisa did not have any common-law duty to disclose information about the status of her romantic relationship to John at the mediation, and she therefore did not commit the tort of fraudulent nondisclosure. On this basis, we affirm the district court's order denying John's motion to set aside the Modified Decree.

¶33  With regard to the court's fee award, however, we reach a different conclusion. John's motion was part of an action to establish an order of alimony or property division, and therefore the court was authorized under subsection (1) of the governing statute to make an award of attorney fees to Lisa. However, the court did not make the findings necessary to support such an award, including findings regarding Lisa's financial need, John's ability to pay, and the reasonableness of Lisa's requested fees. For this reason, we vacate the court's fee award, and we remand the case to the district court for further proceedings.

———————